**NOT DESIGNATED FOR PUBLICATION**

STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

NO. 2019 CA 1274

C. S. GAIDRY, INC. AND SCHWING MANAGEMENT, LLC

VERSUS

LOW LAND CONSTRUCTION COMPANY, INC.,
XYZ INSURANCE COMPANY,
AND HARRY BOURG CORPORATION

Judgment Rendered: **DEC 0 1 2020**

\* \* \* \* \*

On Appeal from the
32nd Judicial District Court
Parish of Terrebonne, State of Louisiana
No. 180027

The Honorable David W. Arcenaux, Judge Presiding

\* \* \* \* \*

Damon J. Baldone
Thomas E. Dunn
Houma, Louisiana

Attorneys for Plaintiffs/Appellants,
C.S. Gaidry, Inc. and Schwing
Management, LLC


Rufus C. Harris, III
Cindy Galpin Martin
New Orleans, Louisiana

Attorneys for Defendant/Appellee,
Low Land Construction Co., Inc.


James M. Funderburk
Standwood R. Duval
Kathryn W. Richard
April Trahan
Houma, Louisiana

Attorneys for Defendant/Appellee,
Harry Bourg Corporation

\* \* \* \* \*

BEFORE: GUIDRY, McCLENDON, AND BURRIS,[1] JJ.

---

[1] The Honorable William J. Burris, retired, is serving *pro tempore* by special appointment of the Louisiana Supreme Court.

McClendon, J. Concurs in the result and assigns reasons.

**BURRIS, J.**

This suit concerns ownership of the NW ¼ of Section 10, T20S-R17E (the disputed property), located in Terrebonne Parish, from which Low Land Construction Co., Inc., (Low Land), removed dirt that it used in a levee project. Low Land removed the dirt pursuant to a contract with Harry Bourg Corporation (HBC), which claimed to be sole owner of the disputed property. C.S. Gaidry, Inc. (Gaidry), and Schwing Management, LLC (Schwing), (collectively, the plaintiffs), instituted this suit against HBC and Low Land, asserting ownership of the disputed property and seeking damages for the unauthorized dirt removal. In a reconventional demand, HBC sought a declaration that it acquired ownership of the disputed property by acquisitive prescription.

The trial court conducted a three-day bench trial where HBC and the plaintiffs presented evidence of their chains of title and acts of ownership on the property. The trial court concluded that HBC and the plaintiffs were at one time co-owners of the disputed property by virtue of record title and that HBC proved that it acquired full ownership by virtue of acquisitive prescription. The trial court rendered judgment declaring HBC to be owner of the disputed property and dismissing all other claims.

The plaintiffs have appealed, contending the trial court erred in rendering judgment in favor of HBC. The plaintiffs maintain that the evidence establishes their clear title to the disputed property and, as owners, they are entitled to damages. They argue the trial court erred in finding that the disputed property was transferred to HBC's ancestor in title and that HBC acquired full ownership by acquisitive prescription. They further challenge the validity of the contract between Low Land and HBC.

Appellate courts review a trial court's decision to grant or deny a declaratory judgment using the abuse of discretion standard. *Mai v. Floyd*, 05-2301 (La. App. 1 Cir. 12/6/06), 951 So. 2d 244, 245, *writ denied*, 07-0581 (La. 5/4/07), 956 So. 2d

2

619. The determination of whether property has been acquired through acquisitive prescription is one of fact and subject to the manifest error/clearly wrong standard of review. *Guitreau v. Clerk of Court for Livingston*, 18-1154 (La. App. 1 Cir. 4/23/19), 2019WL1781380, *3; *see also Rosell v. ESCO,* 549 So. 2d 840, 844 (La. 1989). Under the manifest error standard of review, a reviewing court may not merely decide if it would have found the facts of the case differently. *Hayes Fund for First United Methodist Church of Welsh, LLC v. Kerr-McGee Rocky Mountain, LLC,* 14-2592 (La. 12/8/15), 193 So. 3d 1110, 1115. Rather, to reverse a trial court's factual conclusion, the appellate court must satisfy a two-step process based on the record as a whole: there must be no reasonable factual basis for the trial court's conclusion, and the finding must be clearly wrong. *Hayes,* 193 So. 3d at 1115-16; *Stobart v. State through Department of Transportation and Development,* 617 So. 2d 880, 882 (La. 1993). This test requires a reviewing court to do more than simply review the record for some evidence that supports or controverts the trial court's findings. The court must review the entire record to determine whether the trial court's finding was clearly wrong or manifestly erroneous. *Hayes,* 193 So. 3d at 1116; *Stobart,* 617 So. 2d at 882.

The trial court provided extensive written reasons for judgment that detail the numerous factual findings and determinations it made in weighing the conflicting evidence and determining that the plaintiffs and HBC were co-owners of the property and that HBC acquired full ownership by acquisitive prescription. After thoroughly reviewing the record and applicable law, we are unable to say the trial court was clearly wrong or manifestly erroneous in its findings. As explained in the trial court's excellent reasons for judgment, which we attach hereto as Appendix A, the record supports the trial court's determinations. Consequently, the trial court did not err in dismissing the plaintiffs' claims for the value of the dirt removed from the property. The plaintiffs' claims regarding the validity of the dirt contract are moot.

3

We affirm the judgment of the trial court and issue this opinion in accordance with Uniform Rules – Courts of Appeal, Rule 2-16.1B. Costs of this appeal are assessed to C.S. Gaidry, Inc., and Schwing Management, LLC.

**AFFIRMED.**

STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

2019 CA 1274


C. S. GAIDRY, INC. AND SCHWING MANAGEMENT, LLC

VERSUS

LOW LAND CONSTRUCTION COMPANY, INC., XYZ INSURANCE COMPANY, AND HARRY BOURG CORPORATION

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**McClendon, J., concurring.**

Given the expansive language in the April 10, 1942 act of sale between Ashby W. Pettigrew and Harry Bourg, I concur in the result reached by the majority.

# APPENDIX A

## REASONS FOR JUDGMENT

On May 23, 2017, the C.S. Gaidry, Inc. (hereinafter referred to as Gaidry), and Schwing Management, LLC (hereinafter referred to as Schwing), filed this suit asserting a claim against the defendants for removal of soil from land located in the NW 1/4 of Section 10, T20S-R17E, in Terrebonne Parish in Dulac, Louisiana. The plaintiffs alleged that Low Land Construction Company, Inc. (hereinafter referred to as Low Land), pursuant to a contract with the Harry Bourg Corporation (hereinafter referred to as HBC), removed dirt from the property in question for use in connection with a local levee project. The plaintiffs alleged that they were the owners of the property and that the dirt was removed without their knowledge or consent.

Named as defendants were Low Land, HBC, and the unknown insurer of Low Land. The plaintiffs claimed various items of damage, including claims for payment for the dirt removed and devaluation of the immovable property.

In response to the plaintiffs' petition, HBC asserted exceptions of prescription, nonjoinder of indispensable parties, no cause of action, and no right of action, and otherwise generally denied the plaintiffs' allegations. In addition, HBC filed a reconventional demand seeking a declaratory judgment "recognizing its good faith possession as owner for decades" and asserting a claim of ownership by acquisitive prescription. Finally, HBC asserted what could be characterized as an alternative cross claim against Low Land. However, HBC indicated that it was merely reserving its right to assert such a claim, and it requested that service of its claim on Low Land be withheld.

Low Land also responded to the plaintiffs' initial

1

petition and generally denied the allegations against it. It also asserted exceptions of prescription, no cause of action, and no right of action. Low Land also reconvened against the plaintiffs, seeking the value of improvements made by it to the land in question during the course of its excavation of the property. Further, Low Land asserted an alternative cross claim against HBC for breach of the dirt removal contract.

In response to the alternative cross claim by Low Land against HBC, HBC asserted an exception of prescription, and generally denied Low Land's claim. HBC further asserted a reconventional demand against the cross claimant, Low Land, seeking indemnification and defense. Low Land, in response to this reconventional demand, asserted exceptions of no cause of action and no right of action, and denied HBC's claim of indemnification and defense.

In separate pleadings, the plaintiffs denied all of the allegations of HBC and Low Land in their respective reconventional demands.

On July 19, 2017, the plaintiffs filed a supplemental and amending petition seeking to recover from HBC additional sums obtained by HBC for various leases of the subject property to third persons for cattle grazing, hunting, and agriculture. By answer filed July 20, 2017, HBC denied that it owed the plaintiffs anything as a result of those leases.

On August 14, 2018, the plaintiffs attempted to amend and supplement their original petition a second time by adding an alleged insurer of Low Land, Beacon Insurance Company, as a defendant. The plaintiffs' request to amend and supplement the petition was denied.

Trial of this matter was conducted without a jury on October 1, 2, and 3, 2018. On the first day of trial immediately before the trial began, all of the parties entered into a joint stipulation which included the following agreements:

(1) HBC and Low Land agreed that the excavated area or "dirt pit" created by Low Land in the NW 1/4 of Section 10, T20S-

2

R17E, consisted of 5.416 acres, or 235,910.71 square feet, or 55% of the total pit area, all as reflected by a survey by M.P. Hebert dated June 9, 2017.

(2) HBC and Low Land agreed that the excavated area or "dirt pit" created by Low Land in the SW 1/4 of Section 10, T20S-R17E, consisted of 4.436 acres, or 193,234 square feet, or 45% of the total pit area, all as reflected by a survey by M.P. Hebert dated June 9, 2017.

(3) HBC and Low Land agreed that the records from the Terrebonne Levee District produced as a result of a public records request dated March 31, 2017, were authentic.

(4) HBC and Low Land agreed that the records from the Louisiana Department of Wildlife and Fisheries regarding alligator tags pertaining to the NW 1/4 of Section 10, T20S-R17E, were authentic.

(5) HBC and Low Land agreed that the records from the Terrebonne Parish Sheriff's Office regarding the payment of taxes attributable to the NW 1/4 of Section 10, T20S-R17E, were authentic.

(6) HBC and Low Land agreed that Daniel Toups was an expert in the field of abstracting titles.

(7) Gaidry and Schwing agreed that Gordon White was an expert in the field of abstracting titles.

(8) Gaidry and Schwing agreed that John Mattingly was a land surveyor.

(9) Gaidry and Schwing agreed that Leonard Chauvin was a land surveyor.

(10) Gaidry and Schwing agreed that Low Land paid HBC $4.10 per cubic yard for 181,861 cubic yards of dirt excavated from the dirt pit.

In support of their claims, the plaintiffs offered seventeen items of documentary evidence at trial, to wit:

(a) Plaintiffs' Exhibit No. 1: Copy of the 900 page H.C. Wurzlow Abstract No. 440, together with a March 27, 2017, report from the land abstractor, Daniel J. Toups, based thereon, regarding the NW 1/4 of Section 10, T20S-R17E; two limited supplemental abstracts of title prepared by Daniel J. Toups Land Title Services

3

(hereinafter referred to as Toups Title) and identified as no. 2017-202 and no. 2018-211, regarding the same property; an extract of a list of documents from Toups Title abstract no. 2017-202; and the curriculum vitae of Mr. Toups.

(b)   Plaintiffs' Exhibit No. 2:   Copies of twelve documents recorded in the records of the Clerk of Court, Terrebonne Parish, Louisiana, referred to, among others, in the Toups Title abstract no. 2018-211.

(c)   Plaintiffs' Exhibit No. 3:   Copies of thirty-eight documents recorded in the records of the Clerk of Court, Terrebonne Parish, Louisiana, referred to, among others, in the Toups Title abstract no. 2017-202.

(d)   Plaintiffs' Exhibit No. 4:   Sixteen "Title Sketches" prepared by Toups Title regarding "Adverse Claimants" to the NW 1/4 of Section 10, T20S-R17E.

(e)   Plaintiffs' Exhibit No. 5:   Copies of four leases by Gaidry to Shannon J. Danos for terms of one year each for the calendar years 2011, 2012, 2013, and 2014, with regard to various parcels of immovable property, and always including the NW 1/4 of Section 10, T20S-R17E.

(f)   Plaintiffs' Exhibit No. 6:   Copies of records of the Terrebonne Parish Sheriff showing payment of property taxes with regard to the NW 1/4 of Section 10, T20S-R17E, for the years 1970 through 2017, inclusive, and apparently referenced by stipulation number 5 described hereinabove.

(g)   Plaintiffs' Exhibit No. 7:   Certified copies of records of the Louisiana Department of Wildlife and Fisheries evidencing alligator licenses issued to Wilson Gaidry between 1984 and 2018, and alligator egg collection permits issued to Dane Ledet with the approval of the "landowner," Wilson Gaidry, including an egg collection permit for 1996 with regard to the NW 1/4 of Section 10, T20S-R17E, and annual renewals thereof through 2018, all apparently referenced by stipulation number 4 described hereinabove.

(h)   Plaintiffs' Exhibit No. 8:   Copy of a one year water fowl hunting lease effective September 10, 1995, by Gaidry as lessor, regarding land which included the NW 1/4 of Section 10, T20S-R17E.

(i)   Plaintiffs' Exhibit No. 9:   Copy of a one year trapping and hunting lease effective September 10, 1995, by Gaidry as lessor, regarding land which included the NW 1/4 of Section 10, T20S-R17E.

(j)   Plaintiffs' Exhibit No. 10:   Copy of a ten year hunting lease effective October 1, 1984, by Gaidry as lessor, regarding land which included the NW 1/4 of Section 10, T20S-R17E.

(k)   Plaintiffs' Exhibit No. 11:   Copy of an oil, gas, and mineral lease dated November 25, 1974, by Lillie Lea McKnight Gaidry, et al., regarding land which included the NW 1/4 of Section 10, T20S-R17E.

(l)   Plaintiffs' Exhibit No. 12:   Terrebonne Parish Tax Assessor aerial photograph of the NW 1/4 of Section 10, T20S-R17E, of unknown date.

(m)   Plaintiffs' Exhibit No. 13:   1998 Google Earth map

4

of the NW 1/4 of Section 10, T20S-R17E.

(n)  Plaintiffs' Exhibit No. 14:  Copy of an act of
sale from Harry Bourg to HBC dated April 7, 1955,
regarding property which included "[a]ll that portion
of Section 10 which lies West of the East bank of Four
Point Canal," without any designation of township or
range, and being described as part of the same property
purchased by Harry Bourg from Ashby W. Pettigrew under
date of April 10, 1942.

(o)  Plaintiffs' Exhibit No. 15:  Copy of an act of
sale from Ashby W. Pettigrew to Harry Bourg dated April
10, 1942, regarding property which included "[a]ll that
portion of Section 10 which lies West of the East bank
of Four Point Canal," without any designation of
township or range.

(p)  Plaintiffs' Exhibit No. 16:  Copy of a Tobin map
depicting Section 10, T20S-R17E.

(q)  Plaintiffs' Exhibit No. 17:  (1) A copy of a sale
from Dulac Planting & Manufacturing Company to Albert
P. Cantrelle, dated October 26, 1910, (2) a copy of
sale from Albert P. Cantrelle to Ashland Planting and
Manufacturing Company, Limited, dated February 16,
1917, (3) a copy of a portion of an apparent mortgage
by Ashland Planting and Manufacturing Company, Limited,
in favor of Bank of Terrebonne and Savings Bank, dated
March 8, 1924, (4) a copy of a mineral lease by Ashland
Planting & Manufacturing Company, Ltd., to Union
Sulphur Company, dated December 23, 1925, (5) a copy of
a portion of a sheriff's sale from Ashland Planting and
Mfg. Co., Ltd., to Madison L. Funderburk, dated May 14,
1927, (6) a copy of a sale with mortgage by Madison L.
Funderburk to A.W. Pettigrew, Incorporated, dated May
25, 1927, (7) a copy of a sale from A.W. Pettigrew,
Inc., to Ashby W. Pettigrew, dated May 12, 1931, (8) a
copy of a cash sale from Ashby W. Pettigrew to Harry
Bourg, dated May 1, 1934, (9) a copy of a sheriff's
sale from Ashland Planting & Manufacturing Company,
Ltd., to Bagley C. Lirette, dated August 3, 1935, (10)
a copy of a compromise agreement between A.W. Pettigrew
and the heirs of R.R. Barrow (Irene Barrow, Zoe Barrow
Topping, Hallette Barrow Cole, and Jennie Barrow
Dawson), dated June 22, 1935, being a portion of
Plaintiffs' Exhibit Nos. 2 and 3, described
hereinabove, (11) a copy of a cash sale by Bagley C.
Lirette to Harry Bourg and Ashby W. Pettigrew, dated
August 7, 1935, (12) an additional copy of Plaintiffs'
Exhibit No. 14, and, (13) an additional copy of
Plaintiffs' Exhibit No. 15.

At trial of this matter, the defendant offered fifty-six

items of documentary evidence, to wit:

(a)  HBC Exhibit No. 1:  Copy of a an act of mortgage
by Ashland Planting and Manufacturing Company, Limited,
in favor of Bank of Terrebonne and Savings Bank, dated
March 8, 1924, a portion of which was included as item
(9) of Plaintiffs' Exhibit No. 17, described
hereinabove.

(b)  HBC Exhibit No. 2:  Copy of the entire record of
the Terrebonne Parish Clerk of Court in the matter
entitled A.W. Pettigrew, Inc. v. Ashland Planting &
Mfg. Co. LTD., docket number 9229, 17th Judicial
District Court, filed December 10, 1926.

5

(c)  HBC Exhibit No. 3:  Copy of the judgment rendered April 4, 1927, included in the record of the matter described as HBC Exhibit No. 2, above.

(d)  HBC Exhibit No. 4:  Copy of a sheriff's sale from Ashland Planting and Mfg. Co., Ltd., to Madison L. Funderburk, dated May 14, 1927, included in the record of the matter described as HBC Exhibit No. 2, above, and a portion of which was included as item (5) of the Plaintiffs' Exhibit No. 17, described hereinabove.

(e)  HBC Exhibit No. 5:  Copy of a sale with mortgage by Madison L. Funderburk to A.W. Pettigrew, Incorporated, dated May 25, 1927, identical to Plaintiffs' Exhibit No. 17, item (6), described hereinabove.

(f)  HBC Exhibit No. 6:  Copy of an oil, gas, and mineral lease by A.W. Pettigrew, Inc., to H.H. Booker with assignment to Alfred M. Barbe, dated March 19, 1928.

(g)  HBC Exhibit No. 7:  Copy of a release of an oil, gas, and mineral lease by Alfred M. Barbe to A.W. Pettigrew, Inc., dated October 4, 1928.

(h)  HBC Exhibit No. 8:  Copy of a sale from A.W. Pettigrew, Inc., to Ashby W. Pettigrew, dated May 12, 1931, identical to Plaintiffs' Exhibit No. 17, item (7), described hereinabove.

(i)  HBC Exhibit No. 9:  A portion of a copy of an undated mineral lease by Ashby W. Pettigrew to Frank Wurzlow.

(j)  HBC Exhibit No. 10:  Copy of a cash sale from Ashby W. Pettigrew to Harry Bourg, dated May 1, 1934, identical to Plaintiffs' Exhibit No. 17, item (8), described hereinabove.

(k)  HBC Exhibit No. 11:  Copy of a compromise agreement between A.W. Pettigrew and the heirs of R.R. Barrow (Irene Barrow, Zoe Barrow Topping, Hallette Barrow Cole, and Jennie Barrow Dawson), dated June 22, 1935, being a portion of Plaintiffs' Exhibit Nos. 2 and 3, described hereinabove, and identical to Plaintiffs' Exhibit No. 17, item (10), described hereinabove.

(l)  HBC Exhibit No. 12:  Copy of a cash sale by Bagley C. Lirette to Harry Bourg and Ashby W. Pettigrew, dated August 7, 1935, identical to Plaintiffs' Exhibit No. 17, item (11), described hereinabove.

(m)  HBC Exhibit No. 13:  Copy of a sheriff's sale from Ashland Planting & Manufacturing Company, Ltd., to Bagley C. Lirette, dated August 3, 1935, identical to Plaintiffs' Exhibit No. 17, item (9), described hereinabove.

(n)  HBC Exhibit No. 14:  Copy of a release of an oil, gas, and mineral lease, by Frank Wurzlow to Ashby W. Pettigrew, dated November 12, 1935.

(o)  HBC Exhibit No. 15:  Copy of an agreement by and between Harry Bourg and Ashby W. Pettigrew, dated February 19, 1938.

(p)  HBC Exhibit No. 16:  Copy of a transfer agreement by and among the heirs of R.R. Barrow (Irene F. Barrow, Zoe B. Topping, Hallette B. Cole, and Jennie B.

Dawson), Christian G. Cole, and Harris Gagne', dated June 22, 1935.

(q) HBC Exhibit No. 17: Copy of an act of sale from Ashby W. Pettigrew to Harry Bourg dated April 10, 1942, regarding property which included "[a]ll that portion of Section 10 which lies West of the East bank of Four Point Canal," without any designation of township or range, identical to Plaintiffs' Exhibit No. 15.

(r) HBC Exhibit No. 18: Copy of an act of sale from Harry Bourg to HBC dated April 7, 1955, regarding property which included "[a]ll that portion of Section 10 which lies West of the East bank of Four Point Canal," without any designation of township or range, and being described as part of the same property purchased by Harry Bourg from Ashby W. Pettigrew under date of April 10, 1942, identical to Plaintiffs' Exhibit No. 14.

(s) HBC Exhibit No. 19: Copy of a boundary agreement by and between HBC and The Louisiana Land and Exploration Company, dated October 11, 1958.

(t) HBC Exhibit No. 20: Copy of a right of way grant by HBC in favor of The Parish of Terrebonne, State of Louisiana, dated July 8, 1963, and a copy of a right of way deed by HBC in favor of The Police Jury of the Parish of Terrebonne, State of Louisiana, dated October 8, 1965.

(u) HBC Exhibit No. 21: Copy of a drainage servitude deed by HBC in favor of The Terrebonne Parish Police Jury, dated July 3, 1975.

(v) HBC Exhibit No. 22: Copy of a judgment rendered in the matter entitled Harry Bourg Corporation v. Nora B. Breaux, docket number 91308, 32nd Judicial District Court, rendered January 31, 1991, and signed February 20, 1991.

(w) HBC Exhibit No. 23: Copy of a grant of servitude by HBC to Terrebonne Levee and Conservation District, dated September 27, 2012.

(x) HBC Exhibit No. 24: Copy of an agreement and amended servitudes by and between HBC and Terrebonne Parish Consolidated Government, dated May 3, 2013.

(y) HBC Exhibit No. 25: Copy of a right-of-way grant by the State of Louisiana to HBC, dated October 17, 2013.

(z) HBC Exhibit No. 26: Copy of a grant of servitudes by and between HBC, Four Point Harbor, L.L.C., and Terrebonne Levee and Conservation District, dated May 4, 2016.

(aa) HBC Exhibit No. 27: Copy of proces verbal of inventory and appraisement from the matter entitled Succession of Hughes Joseph Breaux, docket number 4699, 17th Judicial District Court, dated July 19, 1965.

(bb) HBC Exhibit No. 28: Copies of (1) a cattle grazing lease by HBC to Nora Bourg Breaux, dated August 20, 1968, (2) a cattle grazing lease by HBC to Nora Bourg Breaux, dated January 1, 1980, and, (3) a residential lease by HBC to Nora Bourg Breaux, dated December 22, 1987.

7

(cc)  HBC Exhibit No. 29:  Copy of a cattle grazing and agricultural lease by HBC to Hilton Dumesnil, dated August 20, 1968.

(dd)  HBC Exhibit No. 30:  Copy of a cattle grazing lease by HBC to Carl J. Bourg, apparently dated January 1, 1981.

(ee)  HBC Exhibit No. 31:  Copy of an amendment to the cattle grazing lease described as HBC Exhibit No. 30, above, dated September 9, 1987, consisting of eleven pages, and recorded at entry number 812231 of the records of the Terrebonne Parish Clerk of Court.

(ff)  HBC Exhibit No. 32:  Copy of a lease by HBC to Carl J. Bourg, dated September 11, 1988.

(gg)  HBC Exhibit No. 33:  (1) Copy of a lease by HBC to Herdis James Neil, dated April 21, 1999, (2) copy of a lease by HBC to Herdis James Neil, dated April 21, 2005, and (3) copy of HBC lease ledger regarding Herdis Neil.

(hh)  HBC Exhibit No. 34:  Copy of a lease agreement by HBC to Herdis James Neil, dated April 21, 2011.

(ii)  HBC Exhibit No. 35A:  (1) Copy of notarial act of correction by and between HBC and Herdis James Neil, dated June 28, 2017, regarding a previous lease between the parties, and, (2) a list of documents recorded with the Terrebonne Parish Clerk of Court regarding Section 10 of T20S-R17E, Terrebonne Parish, Louisiana, between March 18, 1924, and March 14, 2017.

(jj)  HBC Exhibit No. 35B:  Summary of tax assessments from 1924 to 1962 regarding property of Ashland Planting & Manufacturing Co., Inc., A.W. Pettigrew, Inc., Ashby W. Pettigrew, Harry Bourg, and HBC.

(kk)  HBC Exhibit No. 36:  Twenty-five photographs evidencing the placement of "posted" signs at various locations by HBC.

(ll)  HBC Exhibit No. 36A:  Five close-up photographs of "posted" signs by HBC.

(mm)  HBC Exhibit No. 37:  Seven photographs evidencing historical fencing.

(nn)  HBC Exhibit No. 38:  Six photographs of brickwork associated with an old sugar mill.

(oo)  HBC Exhibit No. 39:  Eight photographs evidencing agricultural operations.

(pp)  HBC Exhibit No. 40:  Hand-colored "Map of Lands Leased to Hilton Dumesnil by Harry Bourg Corporation," dated August 20, 1968, depicting thirteen specific parcels of land in T20S-R17E, Terrebonne Parish, Louisiana.

(qq)  HBC Exhibit No. 41:  Copies of four maps and/or sketches associated with the lease of land to Carl J. Bourg.

(rr)  HBC Exhibit No. 42:  (1) 1964 United States Department of the Interior geological survey of "Lake Quitman Quadrangle," including lands in T20S-R17E, Terrebonne Parish, Louisiana, and (2) summary of tax assessments from 1924 to 1962 regarding property of

8

Ashland Planting & Manufacturing Co., Inc., A.W. Pettigrew, Inc., Ashby W. Pettigrew, Harry Bourg, and HBC, said summary being identical to HBC Exhibit No. 35B, above.

(ss) HBC Exhibit No. 43: Color-coded "Map of Lands Leased to Hilton Dumesnil by Harry Bourg Corporation," dated August 20, 1968, depicting two specific parcels of land in T20S-R17E, Terrebonne Parish, Louisiana.

(tt) HBC Exhibit No. 44: Excerpt from a Tobin map with reference to T20S-R17E, Terrebonne Parish, Louisiana, depicting property "occupied by Harry Bourg."

(uu) HBC Exhibit No. 45: Copy of "Plat Showing a Portion of Property Claimed by Harry Bourg Corporation being the NW 1/4 of Section 10, T20S-R17E, Terrebonne Parish, Louisiana," dated June 12, 2017, prepared by Morris P. Hebert, Inc., reflecting Google Earth Imagery dated January 25, 2015, with aerial backing, added transparency, and hand-written annotations.

(vv) HBC Exhibit No. 46: Copy of "Map of a Portion of Harry Bourg Corporation Lands and Lands of Harry Bourg Corporation Leased to Nora Breaux, et al in Sections 3, 4, 9, 10 & 37, T20S-R17E, Terrebonne Parish, Louisiana," dated November 30, 1988, revised December 12, 1988, prepared by T. Baker Smith & Son, Inc.

(ww) HBC Exhibit No. 47: Copies of survey records of T. Baker Smith & Son, Inc.

(xx) HBC Exhibit No. 48: Original records of HBC evidencing payment of damages by Electronic Explorations, Inc., to HBC in 1961-1962, for "shooting damages" on "land of Harry Bourg."

(yy) HBC Exhibit No. 49: Handwritten records of Nora Breaux regarding land leased from HBC.

(zz) HBC Exhibit No. 50: Copies of selected business records of HBC leases from 1968 to 1993.

(aaa) HBC Exhibit No. 51: Copies of deer hunting permit agreements by HBC as grantee, to various grantees, from 2004 to 2017.

(bbb) HBC Exhibit No. 52: (1) Copy of "Dirt Contract" dated April 9, 2014, by HBC, as seller, and Low Land, as buyer, and, (2) copy of "Supplemental and Amended Dirt Contract" between the same parties dated February 26, 2015.

(ccc) HBC Exhibit No. 56: Copy of a June 19, 2018, report from the land abstractor, Gordon White, with attachments thereto.

(ddd) HBC Exhibit No. 57: Copy of the March 27, 2017, report from the land abstractor, Daniel J. Toups, regarding the NW 1/4 of Section 10, T20S-R17E, together with a copy of "Abstractor's Opening Note," from the supplemental abstract of title by Toups Title identified as no. 2017-202, and a copy of an excerpt from a Tobin map with reference to T20S-R17E, Terrebonne Parish, Louisiana, depicting property "occupied by Harry Bourg," being the same Tobin map identified as HBC Exhibit No. 44, described hereinabove, and all identical to portions of Plaintiffs' Exhibit No. 1, described hereinabove.

9

(eee)  HBC Exhibit No. 58:   Copy of a May 24, 2018,
"Expert Report" from the land surveyor, John C.
Mattingly, with exhibits attached, to wit:

Exhibit 1:   Identical to HBC Exhibit No. 45,
described hereinabove, without the Google Earth
Imagery dated January 25, 2015, added
transparency, or hand-written annotations.

Exhibit 2:   Identical to HBC Exhibit No. 45,
described hereinabove, without the Google Earth
Imagery dated January 25, 2015, or hand-written
annotations.

Exhibit 3:   Four plats dated May 22, 2018,
overdrawn on satellite imagery depicting lands
in Section 10, T20S-R17E, Terrebonne Parish,
Louisiana.

Exhibit 4:   Plat dated May 22, 2018, showing
the location of various posted signs,
historical fencing, and old sugar mill
brickworks in Section 10, T20S-R17E, Terrebonne
Parish, Louisiana.

Exhibit 4.1:   Identical to HBC Exhibit No. 36,
described hereinabove.

Exhibit 4.2:   Identical to HBC Exhibit No. 37
and HBC Exhibit No. 38, described hereinabove.

Exhibit 5:   Two plats dated May 22, 2018,
overdrawn on satellite imagery dated 1953,
depicting lands in Section 10, T20S-R17E,
Terrebonne Parish, Louisiana, one of which
includes an added transparency depicting fence
lines and other improvements.

Exhibit 6:   Identical to Exhibit 5, above,
except the satellite imagery is dated April 19,
1956.

Exhibit 7:   Identical to Exhibit 5, above,
except the satellite imagery is dated March 8,
1957.

Exhibit 8:   Identical to Exhibit 5, above,
except the satellite imagery is dated February
19, 1965.

Exhibit 9:   Identical to Exhibit 5, above,
except the satellite imagery is dated March 19,
1981.

Exhibit 10:   Identical to Exhibit 5, above,
except the satellite imagery is dated May 9,
1984.

Exhibit 11:   Identical to Exhibit 5, above,
except the satellite imagery is dated October
16, 1987.

Exhibit 12:   Identical to Exhibit 5, above,
except the satellite imagery is dated November
10, 1996.

Exhibit 13:   Identical to HBC Exhibit No. 46.

Exhibit 14:   Copy of undated "Survey Map NE 1/4

T20S-R17E Terrebonne Parish, Louisiana,"
prepared by The Louisiana Land and Exploration
Company, Civil Engineering Department, Houma,
Louisiana.

Exhibit 15: Survey "Field Note Records,"
neither referred to nor explained in the expert
report of John C. Mattingly dated May 24, 2018,
to which this Exhibit 15 is attached as part of
HBC Exhibit No. 58.

Exhibit 16: Copies of various agricultural and
cattle leases, and other documents, consisting
of documents (1) identical to a portion of the
map constituting Exhibit 14 attached as part of
HBC Exhibit No. 58, with the addition of
handwritten designated tracts, (2) identical to
HBC Exhibit No. 22, (3) identical to part of
HBC Exhibit No. 27, (4) identical to HBC
Exhibit No. 28, (5) identical to HBC Exhibit
No. 29, (6) identical to HBC Exhibit No. 30,
(7) identical to HBC Exhibit No. 31, but
including a total of twenty pages (instead of
eleven pages), and apparently including a draft
agreement and/or draft corporate resolution,
(8) identical to HBC Exhibit No. 32, (9)
identical to HBC Exhibit No. 33, (10) identical
to HBC Exhibit No. 34, (11) not introduced into
evidence as a separate exhibit of HBC, but
being a copy of a lease agreement by HBC to
Herdis James Neil, dated April 21, 2017, (12)
identical to part of HBC Exhibit No. 35A, and,
(13) hand-colored sketch of tracts of land in
Section 10, T20S-R17E, Terrebonne Parish,
Louisiana.

During the course of the trial, the court received
evidence by way of the testimony of a number of witnesses called
by the parties. Seven witnesses testified on behalf of the
original plaintiffs Gaidry and Schwing, including:

(a) Daniel J. Toups, an expert land title abstractor
and author of the report and two supplemental title
abstracts identified as parts of Plaintiffs' Exhibit
No. 1;

(b) Roger Webb, a Gaidry shareholder who testified as
to his historic use of the land in the NW 1/4 of
Section 10, T20S-R17E of Terrebonne Parish;

(c) Shannon J. Danos, a commercial fisherman who
testified as to his historic use of the land in the NW
1/4 of Section 10, T20S-R17E of Terrebonne Parish,
under the authority of Gaidry;

(d) Rebecca Gaidry Richey, Gaidry president and
shareholder, who testified about her management of
Gaidry properties, including the NW 1/4 of Section 10,
T20S-R17E of Terrebonne Parish;

(e) Wilson "Doc" Gaidry, Jr., seventy-nine year old
Gaidry officer and shareholder, who testified regarding
the historic use and management of the NW 1/4 of
Section 10, T20S-R17E of Terrebonne Parish, by Gaidry
and members of the C.S. Gaidry family;

(f) Stacie Rabon, the manager of Schwing, who testified

11

regarding its management of the NW 1/4 of Section 10, T20S-R17E of Terrebonne Parish; and,

(g) Leo Bickham, a member of Schwing who testified regarding his use of the NW 1/4 of Section 10, T20S-R17E of Terrebonne Parish, under the authority of Schwing.

The following individuals testified at trial on behalf of the original defendants HBC and Low Land, including:

(a) Leonard J. Chauvin, Jr., a Louisiana registered land surveyor, who testified with particular reference to HBC Exhibit No. 46, a survey map prepared by him;

(b) John Mattingly, a Louisiana registered land surveyor, and author of the report identified as HBC Exhibit No. 58;

(c) Gordon White, an expert land title abstractor and author of the report identified as HBC Exhibit No. 56;

(d) Herdis Neil, a Terrebonne Parish cattleman who testified regarding his use of the NW 1/4 of Section 10, T20S-R17E of Terrebonne Parish, including his use as lessee of HBC;

(e) Nolan Bergeron, seventy-four year old grandson of Harry Bourg, who testified about the historic use of the NW 1/4 of Section 10, T20S-R17E of Terrebonne Parish by HBC and the Harry Bourg family; and,

(f) Ronnie Bergeron, grandson of Harry Bourg and president of HBC, who testified regarding the historic use of the NW 1/4 of Section 10, T20S-R17E of Terrebonne Parish, by HBC and the Harry Bourg family, and his management of HBC.

The court has thoroughly reviewed in great detail all of the pleadings, exhibits, testimonial evidence, and memoranda offered by the parties, and has thoroughly considered the arguments of counsel. The court has rendered judgment in accordance with these reasons for judgment.

The following facts have been well-established by the evidence adduced in this case.

<u>HBC's Record Title</u>

The following is a summary of the critical juridical acts in the record chain of title of HBC to the NW 1/4 of Section 10, T20S-R17E, Terrebonne Parish, as set forth by the testimony and report of Gordon White, the expert land title abstractor called at trial by HBC.

By sheriff's sale on May 14, 1927, recorded May 25, 1927, Madison L. Funderburk acquired record ownership of "the North West Quarter (NW1/4)...of Section Ten (10), containing one hundred and fifty nine and sixty hundredths (159.60)...acres...being in Township Twenty

12

(20) South, Range Seventeen (17) East, S.E.D. (La) West of the Miss. River," from Ashland Planting and Mfg. Co., Ltd. (See HBC Exhibit Nos. 2 and 4, and item (5) of Plaintiffs' Exhibit No. 17).

By act of sale with mortgage dated May 25, 1927, and recorded that same day, Madison L. Funderburk conveyed the same property, as described, to A.W. Pettigrew, Incorporated, a/k/a A. W. Pettigrew, Inc. (See HBC Exhibit No. 5, and item 6 of Plaintiffs' Exhibit No. 17.)

By act of sale dated May 12, 1931, and recorded May 13, 1931, A.W. Pettigrew, Inc., conveyed the same property, as described, to Ashby W. Pettigrew. (See HBC Exhibit No. 8, and item 7 of Plaintiffs' Exhibit No. 17.)

By act of sale dated May 1, 1934, and recorded May 2, 1934, Ashby W. Pettigrew conveyed the following described property to Harry Bourg:

> "All that portion of the North-East quarter (NE1/4) of Section 10., T. 20., S. R. 17 East, which lies East of Four Point Canal; Bounded on the West by Four Point Canal, on the North by fractional section Three of T. 20., S. R. 17 East, on the East by Section 11. T. 20., S. R. 17 E., and on the South by the South-East quarter of said Section 10."

This act of sale contained the following additional language:

> "It is the intention of the vendor to sell and he does, by these presents sell and convey unto said Harry Bourg all that property which Vendor owns lying East of Four Point Canal and West of Bayou Sale, regardless of accuracy and detail of description...."

(See HBC Exhibit No. 10, and item 8 of Plaintiffs' Exhibit No. 17.)

By act of sale dated April 10, 1942, and recorded April 13, 1942, Ashby W. Pettigrew conveyed the following described property to Harry Bourg:

> "All that portion of Section 10 which lies West of the East bank of Four-Point Canal."

This act of sale contained the following additional language:

> "It is the intention of Ashby W. Pettigrew to herein sell, and it is the intention of said Harry Bourg to herein buy all of the property which said Ashby W. Pettigrew owns in Sections 10, 15, 22 and 27 of T. 20 S.R. 17 E, whether lying on the West side of [or] the East side of the aforesaid Four-Point Canal, and, if it should hereafter be found that said Ashby W. Pettigrew owns any property in said Sections 10, 15, 22 and 27 which has not been included in the within sale, then and in that event the said Ashby W. Pettigrew obligates himself to sign and execute an act of correction transferring the ownership of such property to the said Harry Bourg."

(See HBC Exhibit No. 17 and Plaintiffs' Exhibit No. 15.)

By act of sale dated April 7, 1955, and recorded that same day, Harry Bourg conveyed the following described property to HBC:

> "All that portion of Section 10 which lies West of the East bank of Four Point Canal."

> "Being the same property purchased by Harry Bourg from Ashby W. Pettigrew under date of April 10, 1942."

(See HBC Exhibit No. 18 and Plaintiffs' Exhibit No. 14.)

### Gaidry and Schwing's Record Title

According to Daniel J. Toups, the expert land title abstractor who testified at trial on behalf of Gaidry and Schwing, the following constitute the important links in the common chain of record title claimed by both plaintiffs, Gaidry and Schwing, with regard to the NW 1/4 of Section 10, T20S-R17E, in Terrebonne Parish.

> By act of sale dated June 5, 1845, and recorded January 24, 1848, Elisha Stevens conveyed to Robert Ruffin Barrow, an undivided one-half interest in and to the NW 1/4 of Section 10, T20S-R17E in Terrebonne Parish. The act did not declare the marital status of Robert Ruffin Barrow. (See Plaintiffs' Exhibit No. 1, H.C. Wurzlow Abstract No. 440, page 6.)

> By judgment rendered June 25, 1866, and recorded November 19, 1869, the community of acquets and gains existing between Robert Ruffin Barrow and his wife, Volumnia Hunley Barrow, was terminated. (See Plaintiffs' Exhibit No. 1, H.C. Wurzlow Abstract No. 440, page 8.)

> By tax sale dated November 19, 1873, and recorded December 12, 1873, total ownership of the NW 1/4 of Section 10, T20S-R17E, Terrebonne Parish, including the interest of Robert Ruffin Barrow acquired from Elisha Stevens on June 5, 1845, was acquired by Peter Berger and Frederick Bogardus. (See Plaintiffs' Exhibit No. 1, H.C. Wurzlow Abstract No. 440, page 852.)

> By confirmation of tax sale dated June 3, 1874, and recorded August 4, 1874, title to the property described above was confirmed in Peter Berger and Frederick Bogardus. (See Plaintiffs' Exhibit No. 1, H.C. Wurzlow Abstract No. 440, page 855.)

> By act of sale dated May 7, 1874, and recorded that same day, Frederick Bogardus conveyed his undivided interest in the property described above to John Berger. (See Plaintiffs' Exhibit No. 1, H.C. Wurzlow Abstract No. 440, page 858.)

> By act of sale dated April 30, 1879, and recorded May 1, 1879, John Berger and Peter Berger conveyed their undivided interests in the property described above to Robert R. Barrow and Van P. Winder, one-half to each.

14

(See Plaintiffs' Exhibit No. 1, H.C. Wurzlow Abstract No. 440, page 887.)

By counter letter dated November 2, 1883, and recorded November 12, 1883, Van P. Winder acknowledged that his one-half interest in the property described above "was only nominally placed in his name," and that it "was really the paraphernal property of "Mrs. Volumnia R. Barrow wife of William J. Slatter." (See Plaintiffs' Exhibit No. 1, H.C. Wurzlow Abstract No. 440, page 896.)

By judgment of possession signed January 15, 1901, in the matter of Succession of Mrs. V.R. Woods, Widow of T. Albert Woods, and recorded January 16, 1901, Mrs. Clara K. Slatter, wife of Wilson J. Gaidry, and Miss Annis Slatter were recognized as the sole heirs of Mrs. Volumnia Roberta Barrow, widow by second marriage of T. Albert Woods, and the owners "in the proportion of the undivided one-half each, of all the property left by deceased." (See Plaintiffs' Exhibit No. 1, H.C. Wurzlow Abstract No. 440, page 99, and Plaintiffs' Exhibits Nos. 2 and 3.)

By compromise agreement dated June 22, 1935, and recorded that same day, Miss Irene Barrow, Mrs. Zoe Barrow Topping, Mrs. Hallette Barrow Cole, and Mrs. Jennie Barrow Dawson agreed, for consideration received, that the ownership of Section 10, T20S-R17E, Terrebonne Parish, belonged to A.W. Pettigrew. (See Plaintiffs' Exhibit No. 1, H.C. Wurzlow Abstract No. 440, page 160, Plaintiffs' Exhibit Nos. 2 and 3, Plaintiffs' Exhibit No. 17, item (10), and HBC Exhibit No. 11.)

By judgment of possession signed April 14, 1938, in the matter of Succession of Robert Ruffin Barrow, and recorded May 14, 1938, Mrs. Jennie Tennant, widow of Robert Ruffin Barrow, was recognized as owner of one-half of all community property, and usufructuary of the deceased's one-half of community property and all separate property, and Miss Irene F. Barrow, Mrs. Zoe Barrow, widow of Robert Topping, Mrs. Harriette Barrow, wife of Christian Grenes Cole, and Mrs. Jennie Barrow, wife of Harris P. Dawson, were recognized as the owners "in the proportions of an undivided one-fourth each" of the separate property of the deceased, subject to the usufruct in favor of Mrs. Jennie Tennant, widow of Robert Ruffin Barrow. (See Plaintiffs' Exhibit No. 1, H.C. Wurzlow Abstract No. 440, page 156.)

By affidavit of heirship dated February 17, 1947, and recorded February 19, 1947, Hallette Barrow, wife of C. Grenes Cole, confirmed the death of her mother, Mrs. Jennie Tennent, widow of Robert Ruffin Barrow, on May 27, 1942, and confirmed the death of her sister, Mrs. Zoe Barrow, widow of Robert Topping, who died intestate and without issue on December 28, 1939. (See Plaintiffs' Exhibit No. 1, H.C. Wurzlow Abstract No. 440, page 158).

Ownership of the Property Based on Record Title

Based on the acts described above and relied upon by the witnesses Gordon White and Daniel J. Toups during their court testimony, the following relevant conclusions can be drawn.

As a result of the April 30, 1879, sale by John Berger

15

and Peter Berger to Robert R. Barrow and Van P. Winder, and the subsequent November 2, 1883, counter letter by Van P. Winder, the NW 1/4 of Section 10, T20S-R17E in Terrebonne Parish was owned one-half by Robert R. Barrow and one-half by Mrs. Volumnia R. Barrow Slatter.

Mr. Barrow's one-half interest in the property purportedly was subsequently acquired by Harry Bourg as a result of purchases from Ashby W. Pettigrew on May 1, 1934, and April 10, 1942. Critical to the record ownership of that one-half interest in the property by Mr. Pettigrew was the June 22, 1935, compromise agreement by and between him and the four daughters of Robert Ruffin Barrow, and the belated February 17, 1947, affidavit of heirship confirming the death of Robert Ruffin Barrow's widow in 1942. Harry Bourg subsequently transferred his ownership of the property at issue to HBC.

None of the transactions referred to in the previous paragraph by and between Ashby W. Pettigrew, Harry Bourg, the daughters of Robert Ruffin Barrow, and HBC addressed the record ownership of the one-half interest in the NW 1/4 of Section 10, T20S-R17E, by Mrs. Volumnia R. Barrow Slatter. The documentary evidence offered by Gaidry and Schwing confirm that her one-half ownership interest passed to her daughters Clara Slatter Gaidry and Annis Slatter, and through them, to Gaidry and Schwing, respectively. No documentary evidence of any kind has been received by the court too indicate that Clara Slatter Gaidry and/or Annis Slatter and/or their successors conveyed any part of this undivided one-half interest to HBC or its ancestors in title.

The court notes that in their post-trial memorandum, the plaintiffs allege that Daniel J. Toups, their "expert in the field of abstracting titles," contends that the plaintiffs are "the current owners of the NW 1/4 of Section 10." Mr. Toups' letter of March 27, 2017, included as part of Plaintiffs' Exhibit No. 1 belies such a conclusion. The following excerpt from Mr. Toups' letter comports with the finding of the court:

16

Harry Bourg Corporation as successor to the interest of Ashby Pettigrew via the Barrow Sisters should be presently the owner of an undivided 1/2 interest in the captioned property. C.S. Gaidry, Inc., as successor of the interest of the Gaidrys via Clara K. Slatter Gaidry should be owner of an undivided 1/4 interest. The Schwings as successors of the interest of Annis Slatter Hickman should be the owners of an undivided 1/4 interest.

The plaintiffs allege Ashby W. Pettigrew did not acquire ownership of any portion of the NW 1/4 of Section 10, T20S-R17E, through Madison Funderburk by way of Mr. Funderburk's acquisition of immovable property from Ashland Planting and Mfg. Co., Ltd., by sheriff's sale on May 14, 1927. The plaintiffs allege the property description reflected by the sheriff's sale repeated an error made in the sale from Dulac Planting & Manufacturing Company to Albert P. Cantrelle, dated October 26, 1910, and which was carried through juridical acts thereafter, including the sale from Albert P. Cantrelle to Ashland Planting and Manufacturing Company, Limited, dated February 16, 1917, and the mortgage by Ashland Planting and Manufacturing Company, Limited, in favor of Bank of Terrebonne and Savings Bank, dated March 8, 1924. The plaintiffs point out that the description used in these acts was "the North West Quarter (NW1/4)...of Section Ten (10), containing one hundred and fifty nine and sixty hundredths (159.60)...acres...being in Township Twenty (20) South, Range Seventeen (17) East, S.E.D. (La) West of the Miss. River." According to the plaintiffs, Dulac Planting and Manufacturing Company did not own the NW 1/4 of Section 10 of T20S-R17E, containing 160 acres, at the time it sold the same to Albert P. Cantrelle. Instead, it owned the NE 1/4 of Section 10, T20S-R17E containing 159.60 acres. As a result, the plaintiffs argue HBC did not acquire record title to the NW 1/4 of Section 10, T20S-R17E.

The court's review of the pertinent public acts tends to confirm that the plaintiffs are correct that Dulac Planting and Manufacturing Company did not own the NW 1/4 of Section 10, T20S-R17E, and did not validly convey the same to Albert P. Cantrelle. However, the plaintiffs' argument overlooks the compromise

17

agreement by and between Ashby W. Pettigrew and the four daughters of Robert Ruffin Barrow dated June 22, 1935, through which it appears Harry Bourg did thereafter acquire a one-half interest in the property at issue.

As a result of the foregoing analysis, the court finds that record title to the NW 1/4 of Section 10 of T20S-R17E at the time of trial of this matter was vested one-half in HBC and one-half in Gaidry and Schwing, i.e., HBC, Gaidry, and Schwing were co-owners of the property.

### Acquisitive Prescription

As co-owners of an undivided interest in the land in question, the plaintiffs certainly are entitled to seek redress from this court for the removal of dirt from their property pursuant to the contract between HBC and Low Land for the attendant consequences thereof. However, in defense to the plaintiffs' claims, HBC has asserted, among other things, that it is entitled to a declaratory judgment from this court decreeing that HBC is the owner of the property to the exclusion of Gaidry and Schwing based on acquisitive prescription. As sole owner of the property, HBC contends that the plaintiffs can have no claims against it.

An understanding of the principles of acquisitive prescription established by the Legislature is important to a resolution of the issues in this case. Acquisitive prescription is a mode of acquiring ownership or other real rights by possession for a period of time. (La. C.C. art. 3446.) Ownership and other real rights in immovables may be acquired by the prescription of ten years (La. C.C. art. 3473) or the prescription of thirty years (La. C.C. art. 3486.) All private things, including land, are susceptible of prescription, unless otherwise excluded by specific legislation. (La. C.C. art. 3485.) There is no doubt that ownership of the land at issue in this case is susceptible of acquisitive prescription.

The requisites for the acquisitive prescription of ten years are (1) possession of ten years, (2) good faith, and (3)

18

just title. (La. C.C. art. 3475.) There is no requirement of good faith or just title to acquire the ownership of immovable property based on possession for thirty years. (La. C.C. art. 3486.) However, the rules regarding possession for the purpose of acquisitive prescription of ten years apply to possession for the purpose of acquisitive prescription of thirty years. (La. C.C. art. 3488.)

Possession is defined as the detention or enjoyment of a corporeal thing, such as land. (La. C.C. 3421). In order to acquire possession for the purpose of acquisitive prescription, one must (1) intend to possess as owner and (2) take corporeal possession of the land in question, that is, he must exercise physical acts of use, detention, or enjoyment over the land. (La. C.C. art. 3424 and 3425.) One is presumed to intend to possess as owner unless "he began to possess in the name of and for another." (La. C.C. art.3427.)

Possession for the purpose of acquisitive prescription must begin with corporeal possession, and it must be continuous, uninterrupted, peaceable, public, and unequivocal. (La. C.C. art. 3476.) Acquisitive prescription does not run in favor of a precarious possessor, i.e., one who possesses without any intent to own another's interest, such as a lessee. Under our law, a co-owner is a precarious possessor. (La. C.C. arts. 3477, 3437 and 3439.) A precarious possessor is presumed to possess for another even though he actually intends to possess for himself. (La. C.C. art. 3438.) This is a rebuttable presumption (La. C.C. art. 3438, comment (b)), and a co-owner or his universal successor may commence to prescribe when he demonstrates "by overt and unambiguous acts sufficient to give notice to his co-owner" that he intends to possess the property for himself. (La. C.C. arts. 3478 and 3439.) In light of the specific presumption established by Louisiana Civil Code article 3438, the more general presumption of Louisiana article 3427 regarding one's intention to possess does not apply to a precarious possessor who is a co-owner.

19

The acquisition and recordation of a title from a person other than a co-owner "may mark the commencement of prescription." (La. C.C. art. 3478.) The particular successor of a precarious possessor who takes possession under an act translative of ownership possesses for himself, and prescription runs in his favor from the commencement of his possession. (La. C.C. art. 3479.)

"Good faith" in the context of acquisitive prescription of ten years is defined as the possessor's reasonable belief "in light of objective considerations, that he is the owner of the thing he possesses." (La. C.C. art. 3480.) Good faith is presumed and neither error of fact nor law defeats the presumption. The presumption is rebutted "on proof that the possessor knows, or should know, that he is not owner of the thing he possesses." (La. C.C. art. 3481.) Good faith need only exist at the commencement of the possession and, subsequent bad faith does not prevent the accrual of the acquisitive prescription of ten years. (La. C.C. art. 3482.)

Louisiana Civil Code article 3483 defines "just title" with regard to acquisitive prescription as follows:

> A just title is a juridical act, such as a sale, exchange, or donation, sufficient to transfer ownership or another real right. The act must be written, valid in form, and filed for registry in the conveyance records of the parish in which the immovable is situated.

One who possesses a part of an immovable by virtue of a title is deemed to have constructive possession within the limits of his title. In the absence of title, one has possession only of the area he actually possesses. (La. C.C. art. 3426.) A just title to an undivided interest in an immovable is a just title only as to the interest transferred. (La. C.C. art. 3484.) When a co-owner of an immovable transfers the ownership of the entire immovable to a third person, the transferee acquires the undivided interest of the transferor, and in addition, he acquires a just title to the remaining parts. Thus, the transferee acquires the ownership of the entire immovable in ten years if he is in good faith and if his possession is

20

sufficiently adverse to the interests of the remaining co-owners. (La. C.C. art.3484, comment (b).) If the transferee's claim of ownership is based on acquisitive prescription of thirty years, his possession extends only to that which he actually possessed, and constructive possession does not apply. (La. C.C. art. 3487.)

It is in light of these principles of Louisiana law that the court has assessed the claims of acquisitive prescription set forth by HBC. At the outset, the court notes that HBC has correctly pointed out that it bears the burden of proving its acquisitive prescription claims by a preponderance of the evidence. Delacroix Corporation v. Perez, 794 So.2d 862 (La. App. 4 Cir. 11/08/00), writ denied, 782 So.2d 635 (La. 1/26/01). However, HBC's burden may be affected by the rebuttable presumptions established by law and described elsewhere herein.

### Good Faith

Possession of land for the purpose of ten years acquisitive prescription must be in good faith, that is, the possessor must have a reasonable belief that he is the owner of the land. The court is required to evaluate the reasonableness of that belief in light of objective considerations. As pointed out above, the good faith of one who possesses as owner is presumed, and it is incumbent upon the one who challenges that good faith to prove that the other knew or should have known that he was not the owner.

The good faith possession of the property at issue by Harry Bourg beginning with his purchase from Ashby W. Pettigrew on April 10, 1942, is presumed. Gaidry and Schwing have not furnished to the court any evidence, credible or otherwise, to show that Harry Bourg did not have a reasonable belief that he was the owner of the entirety of the NW 1/4 of Section 10, T20S-R17E upon the sale to him by Pettigrew. There is no evidence to suggest that Harry Bourg ever acknowledged his co-owner status to anyone. Simply put, the court has not received any evidence upon which it could base a finding that Gaidry and Schwing have

21

overcome the presumption of good faith on the part of Harry Bourg.

The court is satisfied that HBC has established the good faith of Harry Bourg in connection with its claim of acquisitive prescription.

<u>Just Title</u>

In connection with its claim of ten years acquisitive prescription, and in addition to its burden of proving good faith, HBC bears the burden of proving that it possessed the land in question pursuant to a just title.

As pointed out in <u>Delacroix Corporation v. Dean</u>, 901 So.2d 1188 (La. App. 4 Cir. 4/13/05):

> A just title is a juridical act, such as a sale, sufficient to transfer ownership, which must be in proper form and be properly recorded. La. C.C. art. 3483. Comment (b) of the 1982 Revision Comments to Civil Code article 3483 states that the law merely requires an act which, if it were executed by the true owner, would have conveyed ownership.
>
> Louisiana law has long held that in order to convey property, an act of sale must clearly describe the property so that it may be located. As the Louisiana Supreme Court has stated:
>
> > The description in a deed must be such that the property intended to be conveyed can be located and identified, and the general rule is that the description must fully appear within the four corners of the instrument itself, or that the deed should refer to some map, plat or deed as part of the description, so that the same may be clear.

The juridical acts upon which HBC bases its claim in this case consist of the following:

(a) Sheriff's sale on May 14, 1927, by which the property of Ashland Planting and Mfg. Co., Ltd., was conveyed to Madison L. Funderburk;

(b) Act of sale dated May 25, 1927, from Madison L. Funderburk to A.W. Pettigrew, Incorporated, a/k/a A. W. Pettigrew, Inc.;

(c) Act of sale dated May 12, 1931, from A.W. Pettigrew, Inc., to Ashby W. Pettigrew;

(d) Act of sale dated May 1, 1934, from Ashby W.

Pettigrew to Harry Bourg;

(e) Act of sale dated April 10, 1942, from Ashby W. Pettigrew to Harry Bourg; and,

(f) Act of sale dated April 7, 1955, from Harry Bourg to HBC.

The court has reviewed each of these acts and finds them to be in proper form and finds that they were properly recorded in the conveyance records of Terrebonne Parish.

Just title does not mean valid and legal title. As explained hereinabove, these acts did not transfer merchantable title to or ownership of the undivided one-half interest of the NW 1/4 of Section 10, T20S-R17E, presently owned by Gaidry and Schwing, to Harry Bourg or HBC. A just title is a juridical act intended to have legal consequences. It is an act translative of ownership, such as a sale. A just title need not be derived from the true owner because if that were the case, acquisitive prescription would not be an issue. The law merely requires an act which, if it had been executed by the true owner, would have conveyed ownership. (La. C.C. art. 3483, comment (b).)

At issue in this case is the ownership of the NW 1/4 of Section 10, T20S-R17E in Terrebonne Parish. Based on the evidence offered at trial, the court notes that the property consists of 158.774 acres bordered on the east by the NE 1/4 of Section 10, on the south by the SW 1/4 of Section 10, on the west by Section 9 of T20S-R17E, and on the north by Sections 3 and 37 of T20S-R17E. The Four Point Canal, sometimes referred to as the Four Point Bayou, and the adjacent Four Point Road on the western side of the canal, almost completely traverse the NW 1/4 of Section 10 on its eastern side, entering on the east from the northerly part of the NE 1/4 of Section 10, and exiting onto the eastern side of the SW 1/4 of Section 10. Only a relatively small part of the NW 1/4 of Section 10 is located on the eastern side of Four Point Canal, i.e., between Four Point Canal on the west and the boundary line between the NW 1/4 and NE 1/4 of Section 10 on the east. Entirely within this relatively small

part of the NW 1/4 of Section 10, there is located 55%, or 5.416 acres, of the excavated area or "dirt pit" which has led to the instant litigation.

It should be noted that the geographical landmark known as Bayou Sale is located entirely to the east of the NW 1/4 of Section 10.

The act of sale from Ashby W. Pettigrew to Harry Bourg dated May 1, 1934, purported to convey to Harry Bourg, among other things, the following described property:

> "All that portion of the North-East quarter (NE1/4) of Section 10., T. 20., S. R. 17 East, which lies East of Four Point Canal; Bounded on the West by Four Point Canal, on the North by fractional section Three of T. 20., S. R. 17 East, on the East by Section 11. T. 20., S. R. 17 E., and on the South by the South-East quarter of said Section 10."

The description above appears to be limited to property located in the NE 1/4 of Section 10, T20S-R17E, and does not include any portion of the NW 1/4 of Section 10 of that same township and range. Therefore, this act, to the extent it relies on this property description, cannot be said to have been translative of title. However, this act of sale contained the following additional language:

> "It is the intention of the vendor to sell and he does, by these presents sell and convey unto said Harry Bourg all that property which Vendor owns lying East of Four Point Canal and West of Bayou Sale, regardless of accuracy and detail of description...."

The relatively small portion of the NW 1/4 of Section 10, T20S-R17E, described above, is located east of Four Point Canal and west of Bayou Sale. In 1934, no recorded interest in that relatively small portion of property was owned by Ashby W. Pettigrew. On May 1, 1934, at the time of the sale to Harry Bourg, that portion of the NW 1/4 of Section 10, as well as the entire remainder of the NW 1/4 of Section 10, was owned one-half by the heirs of Volumnia Roberta Barrow Slatter Woods (Clara K. Slatter and Annis Slatter), and one-half by the heirs of Robert Ruffin Barrow (Irene F. Barrow, Mrs. Zoe Barrow Topping, Mrs. Harriette Barrow Cole, and Mrs. Jennie Barrow Dawson). Due to the lack of a more specific description, and because Ashby W.

24

Pettigrew did not, in fact, own any portion of the NW 1/4 of Section 10, T20S-R17E, on May 1, 1934, this "catch-all" provision in the act of sale did not render this act of sale translative of title, or a "just title" for purposes of acquisitive prescription.

The act of sale dated April 10, 1942, from Ashby W. Pettigrew to Harry Bourg, purported to convey to Harry Bourg the following described property:

> "All that portion of Section 10 which lies West of the East bank of Four-Point Canal."

As pointed out above, most of the NW 1/4 of Section 10 in T20S-R17E lies west of the east bank of Four Point Canal. For purposes of acquisitive prescription, and considering the specificity of the property description, it is not necessary to determine what interest, if any, Ashby W. Pettigrew actually had in and to the NW 1/4 of Section 10 on April 10, 1942. This property description does appear to render the act translative of title, but only with regard to that portion of the NW 1/4 of Section 10, T20S-R17E, located west of the east bank of Four Point Canal. The description does not purport to transfer any part of the NW 1/4 of Section 10 located east of the eastern bank of Four Point Canal. As pointed out above, a relatively small part of the NW 1/4 of Section 10, but a part particularly important to this case, lies east of the eastern bank of the canal.

The court notes that the two-line property description quoted above does not indicate which Section 10 the description refers to. The township and range are not indicated. Because of the language from the act quoted below, however, the court does not believe this deficiency is of any moment.

The April 10, 1942, act of sale contained the following important additional language:

> "It is the intention of Ashby W. Pettigrew to herein sell, and it is the intention of said Harry Bourg to herein buy all of the property which said Ashby W. Pettigrew owns in Sections 10, 15, 22 and 27 of T. 20 S.R. 17 E, whether lying on the West side of [or] the East side of the aforesaid Four-Point Canal, and, if it should hereafter be found that said Ashby W. Pettigrew

25

owns any property in said Sections 10, 15, 22 and 27 which has not been included in the within sale, then and in that event the said Ashby W. Pettigrew obligates himself to sign and execute an act of correction transferring the ownership of such property to the said Harry Bourg."

On April 10, 1942, Ashby W. Pettigrew did own an undivided one-half interest in and to the entirety of the NW 1/4 of Section 10, T20S-R17E, both on the east and west sides of the Four Point Canal, having acquired the same by the compromise agreement by and between him and the four daughters of Robert Ruffin Barrow dated June 22, 1935. For that reason, the court finds that the act of sale dated April 10, 1942, was translative of title, at least to the extent of Ashby W. Pettigrew's undivided one-half interest therein. The question remains as to whether the act was translative of title to the undivided portion of the property not owned by Mr. Pettigrew.

The answer to the question appears to be in the affirmative. As pointed out hereinabove, a just title to an undivided interest in an immovable is a just title only as to the interest transferred. (La. C.C. art. 3484.) When a co-owner of an immovable transfers the ownership of the entire immovable to a third person, the transferee acquires the undivided interest of the transferor, and in addition, he acquires a just title to the remaining parts. Thus, the transferee acquires the ownership of the entire immovable in ten years if he is in good faith and if his possession is sufficiently adverse to the interests of the remaining co-owners. (La. C.C. art.3484, comment (b).)

The April 10, 1942, act of sale from Ashby W. Pettigrew to Harry Bourg, does not purport to convey merely an undivided interest in and to any of the properties described therein. A fair reading of the act, which was a sale with all legal warranties, does not suggest that Ashby W. Pettigrew thought he was selling only an undivided interest or that Harry Bourg thought he was buying less than the whole of the properties.

By act of sale dated April 7, 1955, Harry Bourg conveyed to HBC:

"All that portion of Section 10 which lies West of the

26

East bank of Four Point Canal."

"Being the same property purchased by Harry Bourg from Ashby W. Pettigrew under date of April 10, 1942."

Clearly, this act of sale conveyed the largest portion of the NW 1/4 of Section 10, T20S-R17E, referred to above, and owned by Harry Bourg, to HBC. However, the act of sale in all of its myriad of property descriptions contained therein, does not mention any other property located in Section 10, specifically the NW 1/4 thereof. In order to find that the remaining portion of the NW 1/4 of Section 10, i.e., the relatively small portion, was conveyed to HBC by Harry Bourg on April 7, 1955, and that the act, therefore, constitutes "just title," the court would have to conclude that the phrase, "[b]eing the same property purchased by Harry Bourg from Ashby W. Pettigrew under date of April 10, 1942," in the 1955 act of sale, included the conveyance of the smaller portion of the NW 1/4 of Section 10 on the east side of Four Point Canal, purchased by Harry Bourg by way of the "important additional language" referred to above and included in the April 10, 1942, act of sale.

The court finds that the April 7, 1955, act of sale by Harry Bourg to HBC conveyed valid title of Harry Bourg's undivided one-half interest in and to all of the NW 1/4 of Section 10 on both sides of the east bank of Four Point Canal, and just title to the other undivided one-half interest. The court is persuaded in this conclusion by the precise language used in the 1955 act, to wit, "[b]eing the same property purchased," rather than language that could have been used, such as "being part of the same property purchased." As the particular successor of Harry Bourg in the 1955 act of sale, HBC is entitled to rely on the "just title," in favor of Harry Bourg created by the act of sale to him dated April 10, 1942.

For the foregoing reasons, the court finds that HBC has established by a preponderance of the evidence the necessary prerequisites of just title (as distinguished from good or merchantable title) and good faith to support a claim of acquisitive prescription of ten years with regard to the NW 1/4

27

of Section 10, T20S-R17E, Terrebonne Parish, Louisiana.

## Possession

It remains for the court to address the possession requirement necessary for HBC to prevail on its argument that it is the owner, by way of acquisitive prescription, of the undivided interest in the property titled in the names of Gaidry and Schwing. The bulk of the evidence offered at trial by HBC dealt with this issue.

As noted hereinabove, possession, for the purpose of acquisitive prescription, must begin with corporeal possession, and it must be continuous, uninterrupted, peaceable, public, and unequivocal. The possessor must intend to possess as owner, that is, for himself and not with an intent to possess for someone else such as a lessor or co-owner.

It is against this legal background that the court has considered the evidence offered by HBC to support its claim that it acquired the ownership of the undivided interests of its co-owners in the property by possession of the same based on overt and unambiguous acts of possession evidencing its intent, and the intent of its ancestor in title, Harry Bourg, to do so.

In an effort to prove this intent to possess the NW 1/4 of Section 10, T20S-R17E, adversely to its co-owners, Gaidry and Schwing, HBC offered a variety of documentary evidence and testimony at trial on this issue. All of this evidence, which has been carefully analyzed by the court, falls into six distinct categories, to wit:

(1) The posting of signs;

(2) Agricultural use and fencing;

(3) Property taxes;

(4) Servitude agreements and other written public acts;

(5) Hunting and fishing; and,

(6) Mineral exploration and activity.

## The Posting of Signs

The documentary evidence offered by HBC to prove that HBC posted the land in question consists of HBC Exhibit Nos. 36,

28

36A, and 58. These documents together with the testimony of Roger Webb, Shannon J. Danos, Wilson "Doc" Gaidry, Jr., Leonard J. Chauvin, Jr., John Mattingly, Herdis Neil, Nolan Bergeron, and Ronnie Bergeron confirm that signs were posted as early as the late 1950's, after the act of sale to HBC by Harry Bourg. The preponderance of the evidence suggests the signs were posted primarily on telephone poles and trees all along both the east and west sides of Four Point Road in the NW 1/4 of Section 10, and north and south of that property. At the time of trial, some seventy years after HBC acquired its interest in the property, there were nine signs in the NW 1/4 of Section 10 which read, "Posted Harry Bourg Corp. 7477 Grand Caillou Rd. Dulac, LA. 70353."

The court does not believe that signs like the ones described above were posted anywhere else on the approximately 160 acres of the NW 1/4 of Section 10. Other than the Four Point Canal and the adjacent Four Point Road, there were no convenient methods of ingress to the property. It is reasonable to conclude that the signs were intended to aid in the prevention of trespassing upon the land by passersby on the road. The signs were visible to the public. This was confirmed by Roger Webb, a witness for the plaintiff, who visited the property as early as 1986, and Wilson Gaidry, Jr., a seventy-nine year old member of the Gaidry family, who has been familiar with the property since at least 1955. Both confirmed that neither of them was ever asked to leave the property by anyone, and that their access to the property was never denied or obstructed in any way by anyone. Testimony to the same effect was received from Leo Bickham, who hunted on the property from 1978 through at least 2004 with the permission of the plaintiffs.

Both Mr. Webb and Mr. Gaidry testified that they knew Gaidry and Schwing co-owned the property with HBC and neither of them understood the signage to indicate that HBC considered itself sole owner of the property. Mr. Gaidry testified that he never thought HBC was possessing the property to the exclusion of

29

the Gaidry and Schwing interests. Nolan Bergeron, the seventy-four year old grandson of Harry Bourg, testified that he did not know anyone else co-owned the property with HBC.

Mr. Gaidry, a resident of Terrebonne Parish, and a former president of Gaidry, testified that he was involved in the management of the Gaidry and Schwing properties, including the NW 1/4 of Section 10, almost all of his life. He testified that he has visited the property at issue at least twice a year since 1955, primarily to hunt and trap. It is apparent that Mr. Gaidry generally accessed the property via the western side, by boat through the low-lying areas historically prevalent on the western side of the NW 1/4 of Section 10 and other properties adjacent thereto. There was no evidence received at trial to suggest that anyone associated with Gaidry or Schwing utilized the relatively small portion of the NW 1/4 of Section 10 on the east side of Four Point Canal for any purpose at any relevant time.

## Agricultural Use and Fencing

A great deal of the evidence offered at trial by HBC confirmed the corporeal possession and use of the NW 1/4 of Section 10 by and through HBC for agricultural purposes, including attendant fencing. The court notes that the evidence at trial offered by HBC confirms that no residences were established on the land. The evidence establishes that the home of Nora Bourg Breaux, the daughter of Harry Bourg, and her husband Hughes Joseph Breaux, was located well north of the NW 1/4 of Section 10, in adjacent Section 37 of T20S-R17E. The evidence also confirms that the mobile home occupied as a residence by either Carl Bourg, Harry Bourg's grandson, or Carl J. Bourg's son, Jason, on the east side of Four Point Canal, was not in the NW 1/4 of Section 10, but in the adjacent SW 1/4 of Section 10.

The court is convinced that suitable areas of the NW 1/4 of Section 10 were used since 1942 by Harry Bourg and/or HBC, either directly or through others on their behalf, for the cultivation of sugar cane and the grazing of cattle at various

30

times. The cultivation of sugar cane was primarily in the areas of higher elevation relatively unaffected by water and marshy land conditions, mainly along the east and west sides of Four Point Road. The cattle grazing operations were more extensive, extending at times to the western and northern section line boundaries, and necessarily included the need to install fencing on and beyond the property.

The documentary evidence in support of the court's findings consist of HBC Exhibits 27, 28, 29, 30, 31, 32, 33, 34, 35A, 37, 38, 39, 40, 41, 43, 46, 49, 50, and 58. These documents, along with the testimony of Wilson "Doc" Gaidry, Jr., Leonard J. Chauvin, Jr., John Mattingly, Herdis Neil, Nolan Bergeron, and Ronnie Bergeron, support the following conclusions by the court.

The eight aerial photographs spanning the years 1953-1996 made part of Mr. Mattingly's report in this case are tremendously helpful to understanding the topographical development of the NW 1/4 of Section 10 during that forty-three year period. From 1953 to 1956, cultivable fields developed over a substantial part of the southern part of the NW 1/4, and this condition appears to have continued to a significant degree at least through 1987 on both sides of Four Point Canal. By 1996, there does not appear to be any evidence of cultivation, but it does appear there were substantial areas of cleared pasture area suitable for the grazing of cattle on large expanses of the NW 1/4 of Section 10 through at least 1987, on both sides of Four Point Canal, and at least through 1996 on the eastern side of the canal. These topographical findings are consistent with the documentary evidence offered by HBC regarding use of the property for cultivation of sugar cane and the grazing of cattle.

When Hughes Joseph Breaux, the son-in-law of Harry Bourg died in 1965, it was reported by way of his succession proceeding that he owned significant sugar cane farming equipment, standing sugar cane crops, and the rights as lessee under a verbal agricultural lease from Harry Bourg and/or HBC affecting lands in

31

Section 10 of T20S-R17E. It appears that prior to his death, he farmed the NW 1/4 of Section 10 on the west side of the Four Point Road with the permission of Harry Bourg or/and HBC, certainly since at least 1956. Based on the satellite imagery of the property in 1965, it appears this farming by Mr. Breaux continued at least until his death. The evidence the court received also confirms that prior to his death, Mr. Breaux and his wife, Nora Bourg Breaux, used the same portions of the NW 1/4 of Section 10 to graze cattle. Except for the time between 1968 and 1978, when it appears this property was leased to Hilton Dumesnil by HBC, Mrs. Breaux used the same property for cattle grazing until her death in 2000. The property was located just south of the Breaux homestead and it appears to have been used as an extension of the property on which they resided in the adjacent Section 37 of T20S-R17E. No one has furnished to the court any publicly recorded documentary evidence confirming that Mr. and Mrs. Breaux possessed any part of the NW 1/4 of Section 10 pursuant to any written agreement with HBC or Harry Bourg at any time, except the judgment of February 20, 1991, discussed hereinbelow.

Based on the satellite imagery received by the court, it appears that sometime between 1981 and 1984, someone caused to be constructed along the southern half of the extreme western side of the NW 1/4 of Section 10, a drainage canal, apparently for the purpose of containing an area known as the "Cenac Duck Pond," located in the adjacent Section 9 of T20S-R17E. This canal, along with fencing and another drainage canal, all located largely outside of the NW 1/4 of Section 10, served to prevent cattle from escaping their complete enclosure. The only portion of fenceline in the NW 1/4 of Section 10 which contributed to this larger "pen" was a barbed wire fenceline that meandered more or less from the northern boundary of the quarter section along the rear of a woodline located along Four Point Road, and then a short distance along Four Point Road itself to the southern boundary of the quarter section. This fencing, estimated by

32

Leonard J. Chauvin, Jr., to have been ten to twenty-five years old in 1988, obviously was intended to contain the cattle Mr. and Mrs. Breaux were running on the property prior to that time. Mr. Gaidry testified that he observed what he called "random fencing" on the west side of the NW 1/4 of Section 10 during his many visits to the property and he observed the cattle grazing there. As a cattleman himself, he knew Mr. and Mrs. Breaux were in the cattle business. Both Leonard J. Chauvin, Jr., and John Mattingly testified that all fencing at issued in this case was designed to keep cattle inside the fence, not to keep people outside the fence.

On February 20, 1991, a judgment was rendered by the 32nd Judicial District Court as a result of litigation by and between HBC and Mrs. Breaux. Apparently, there was a disagreement between Mrs. Breaux and HBC as to the northern and southern boundaries of property subject to a "surface lease" dated January 1, 1980, between the parties. The judgment recognized the northern boundary of the lease along a drainage ditch in Section 37, north of the NW 1/4 of Section 10, all in T20S-R17E. The judgment recognized the southern boundary of the lease along a fence line located entirely in the SW 1/4 of Section 10. Importantly, even though the judgment never mentions the NW 1/4 of Section 10, the map attached to the judgment along with the written description of the northern and southern boundaries, leave no doubt that the entirety of the NW 1/4 of Section 10 west of Four Point Canal, and other lands of HBC, were subject to a January 1, 1980 "surface lease" from HBC to Mrs. Breaux. This January 1, 1980, "surface lease" appears to be a January 1, 1980, cattle grazing lease from HBC to Mrs. Breaux, with a term of ten years. In turn, that January 1, 1980, document appears to be a successor to an August 20, 1968, lease of similar character. Both the August 20, 1968, and January 1, 1980, leases, declared that "this lease shall not be recorded in the Conveyance or other public records of the Parish of Terrebonne." The court was furnished copies of these two leases

and has reviewed the same in connection with the February 20, 1991, judgment.

In 1968, by recorded lease, HBC granted Hilton Dumesnil an agricultural and cattle grazing lease over HBC properties in Terrebonne Parish, good for five years with an option to renew for an additional five years. The rental was declared to be one-sixth of all the sugar cane produced and harvested. Based on a review of this document, and a color-coded map of the properties described therein maintained by HBC, the court has concluded that HBC did include in that lease land in the southernmost part of the NW 1/4 of Section 10, T20S-R17E on the west side of Four Point Canal, and all the land in the NW 1/4 of Section 10, T20S-R17E, located on the east side of Four Point Canal. The lease agreement was contemporaneously recorded in the conveyance records of Terrebonne Parish. The land appears to include part of the property that was subsequently leased to Nora Bourg Breaux by HBC in 1980, discussed hereinabove, and part of the property that was subsequently leased to Carl J. Bourg by HBC in 1980, discussed hereinbelow.

The lease of property in the NW 1/4 of Section 10 by HBC to Nora Bourg Breaux was limited to land on the west side of Four Point Canal. The evidence received by the court at trial confirms that HBC was active in the leasing of the relatively small part of the NW 1/4 of Section 10 on the east side of the canal, as well.

The satellite imagery described above and reviewed by the court shows that most of the NW 1/4 of Section 10 located on the east bank of Four Point Canal was under cultivation by 1953, even before that portion of the section property located on the western side of the canal. According to Herdis Neil, age 71, who currently uses the property for cattle grazing, one can still detect the pattern of cultivated rows running in an east-west direction even though no crops have been grown on the property for more than thirty-five years. It is highly probable that the property was cultivated for the purpose of growing sugar cane

34

inasmuch as the surrounding property was used for that purpose, the remnants of the brickworks of an old sugar mill are located just north of the property in Section 37, T20S-R17E, and the property was leased for up to ten years to Hilton Dumesnil for the purpose of cattle grazing and sugar cane cultivation.

By agreement dated January 1, 1980, HBC leased to Carl J. Bourg, Harry Bourg's grandson, property on the east side of Four Point Canal for cattle grazing for ten years. Based on a subsequent amendment to this lease agreement, dated September 9, 1987, it appears the original cattle grazing lease included all of the NW 1/4 of Section 10 located on the east side of Four Point Canal. The 1987 amendment expanded the lease to permit use of the property for agricultural purposes, hunting and trapping purposes, as well as for the purpose of cattle grazing.

While the 1987 amendment to the original lease was contemporaneously recorded, recordation of the 1980 original lease was expressly forbidden. The 1987 amendment references Carl J. Bourg's father, Albert Bourg, Harry Bourg's only son, and indicates that he was a previous lessee of the property described in the amendment.

HBC offered at trial of this matter, another contract of lease to Carl J. Bourg, dated September 11, 1988, and effective for ten years. This agreement appears to be similar to the 1980 lease agreement as amended in 1987. However, the court has concluded, based on its examination of the sketch attached to the document, that it did not include the lease of any property in the NW 1/4 of Section 10, T20S-R17E.

The evidence received by the court convinces the court that Carl J. Bourg was using the property on the east side of Four Point Canal and at issue in this case for the grazing of cattle, at least from 1980. Before that time, his father, or someone on behalf of HBC such as Hilton Dumesnil, or Harry Bourg, more probably than not used the property for the grazing of cattle and/or cultivation of sugar cane at least since 1953.

According to Herdis Neil, Carl J. Bourg abandoned his

lease of the NW 1/4 of Section 10, on the east side of Four Point
Canal in 1999. Shortly thereafter, by agreement dated April 1,
1999, and contemporaneously recorded in the conveyance office in
Terrebonne Parish, HBC leased to Mr. Neil "for cattle grazing
purposes only," lands which included the section property on the
east side of the canal. This lease was effective for up to six
years. By recorded agreement effective April 21, 2011, as
amended by a recorded act dated June 28, 2017, HBC leased the
same property for the same purpose to Mr. Neil, again for up to
six years. The amendment reduced the number of acres leased due
to the excavation of part of the land to remove the dirt that is
at issue in this case.

### Property Taxes

The court has examined the limited information furnished
by HBC regarding the assessment of property taxes by the
Terrebonne Parish Tax Assessor, principally from 1924 to 1962 as
reflected by HBC Exhibit Nos. 35B and 42. These exhibits consist
of a summary of assessments against various owners for various
parcels of land during those years.

From 1924 until 1927, inclusive, Ashland Planting &
Manufacturing Co., Inc., was assessed for the ownership of 5000
acres known as the Dulac Plantation in Ward 4 of Terrebonne
Parish. All of the property at issue in this case is located in
Ward 4. In 1928, no property in Ward 4 was assessed in the name
of that company, but the same property was assessed in the name
of A.W. Pettigrew, Inc., beginning in 1928 and continuing through
1931. In 1932, no property in Ward 4 was assessed in the name of
A.W. Pettigrew, Inc., but the same property was assessed in the
name of Ashby W. Pettigrew, or A.W. Pettigrew, beginning in 1932
and continuing through 1934. In 1935, A.W. Pettigrew was
assessed for all of Dulac Plantation "west of Four Point Canal,"
while Harry Bourg was assessed for the first time only for the
following described property "east of Four Point Canal" and
located in Section 10, T20S-R17E:

(a) The W 1/2 of the SE 1/4; and,

36

(b) The NE 1/4.

The assessment to A.W. Pettigrew in 1935 continued unchanged through 1942. However, beginning in 1936, the assessment in the name of Harry Bourg grew to include additional properties in T20S-R17E, incorrectly identified as being exclusively on the east side of Four Point Canal. However, none of the property in Section 10 included the NW 1/4 thereof.

In 1943, Harry Bourg's assessment was the same, but curiously, there was no longer any assessment for property of A.W. Pettigrew, then or thereafter. In 1944, Harry Bourg's assessment was the same.

In 1945, Harry Bourg's assessment changed dramatically. The new assessment consisted of two parts. The first part was identical to the 1935 assessment, simply the W 1/2 of the SE 1/4 and the NE 1/4 of Section 10, T20S-R17E, all east of Four Point Canal. The second part was a new assessment which did not expressly include the specific tracts of land for which Harry Bourg had been assessed in the years 1936 through 1944. Instead, the second part of the new assessment was revised to read as follows:

> "The unsold portion of Dulac Plantation west of Four Point Canal and Bayou Dulac and East of Bayou Grand Caillou in Township 19 and 20 South, Range 17 East, including parts of Sections 3, 10, 15, and 22, T20S-R17E among other property."

This two part assessment in the name of Harry Bourg continued in identical form through 1954. Beginning in 1955 and until 1962, when the records furnished to the court end, this same two part assessment appears only in the name of Harry Bourg Corporation.

The lack of any assessment in the name of Ashby W. Pettigrew beginning in 1943, coincides with his April 10, 1942, sale to Harry Bourg. There is no rational explanation as to why no one was assessed in 1944 for the additional property for which Harry Bourg and HBC were assessed beginning in 1945.

The court has not been furnished any evidence that during those same years, i.e., 1924 through 1962, any property in

37

Ward 4 was assessed in the names of Gaidry or Schwing or their ancestors in title.

Based on the foregoing, and after comparing the descriptions in the April 10, 1942, purchase by Harry Bourg to the tax assessor's description of property assessed to Harry Bourg and HBC, the court believes the entire ownership interest in the land at issue in this case was assessed first to Harry Bourg beginning in 1945, and subsequently to HBC, and that they paid the property taxes due on the property through at least 1960. The court's finding is supported by the records of the Terrebonne Parish tax assessor offered as HBC Exhibit No. 56.

The court is also convinced that sometime in 1960 or 1961, the Terrebonne Parish tax assessor realized that Harry Bourg Corporation was not record owner of a one hundred percent interest in the NW 1/4 of Section 10, T20S-R17E. HBC Exhibit No. 56 reveals that in 1961 the Terrebonne Parish Sheriff began collecting property taxes from the ancestors in title of Gaidry and Schwing for assessments of the NW 1/4 of Section 10, T20S-R17E. The evidence offered to the court, particularly HBC Exhibit No. 57 and Plaintiffs' Exhibit No. 6, indicates that since 1961, both HBC and the Gaidry and Schwing interests have paid property taxes attributable to this property at various times, and that the assessor has not been consistent in identifying the interest of each party to the assessments.

For some unknown reason, for the tax year 2017, the tax assessor assessed Gaidry and Schwing for one hundred per cent of the NW 1/4, Section 10, T20S-R17E.

The court has not received any evidence to show that the tax assessor, while adjusting the assessments of Gaidry and Schwing, beginning in 1961 and ending in 2017, ever adjusted the assessment against HBC to reflect this new assessment against Gaidry and Schwing. The description of the property assessed to HBC remained unchanged in relevant part throughout these years. The court believes it is more probable than not that the NW 1/4 of Section 10, T20S-R17E, was subject to dual assessment since

38

1961.

## Servitude Agreements and Other Written Public Acts

In an effort to prove its overt and unambiguous acts of possession of the property at issue, HBC offered numerous publicly recorded written acts allegedly evidencing its ownership and possession, all reflected by HBC Exhibit Nos. 19, 20, 21, 23, 24, 25, 26, and 52.

The first such document is a copy of a boundary agreement by and between HBC and The Louisiana Land and Exploration Company, dated October 11, 1958. The court has determined that this document does not apply to any part of the NW 1/4 of Section 10, T20S-R17E.

The second document is a copy of a right of way grant by HBC in favor of The Parish of Terrebonne, State of Louisiana, dated July 8, 1963. The act grants a right-of-way for a public roadway approximately 700 feet in length in accordance with a map purported to be attached to the act. The map is not attached, and the court is unable to determine if this length of roadway is located within the NW 1/4 of Section 10, T20S-R17E. HBC also submitted a copy of a right of way deed by HBC in favor of The Police Jury of the Parish of Terrebonne, State of Louisiana, dated October 8, 1965. This document refers to a grant of right-of-way for public road purposes. The property description therein is vague, and it is impossible for the court to determine if this servitude grant affects the NW 1/4 of Section 10, T20S-R17E.

HBC also submitted to the court a copy of a drainage servitude deed by HBC in favor of The Terrebonne Parish Police Jury, dated July 3, 1975. The described servitude is one hundred fifty feet wide along with a centerline along existing levees referred to in the document. The map attached to this document clearly shows the servitude grant substantially impacts the land in the NW 1/4 of Section 10, T20S-R17E.

The next document offered by HBC is a copy of a grant of a mitigation servitude by HBC to Terrebonne Levee and

39

Conservation District, dated September 27, 2012. The servitude is intended to afford the grantee levee district an opportunity to create a "mitigation and/or marsh creation project." The lands affected by the servitude are depicted on a map attached to the document, and they do not appear to include any part of the NW 1/4 of Section 10, T20S-R17E.

The next document offered for the court's consideration is a copy of an agreement and amended servitudes by and between HBC and Terrebonne Parish Consolidated Government, dated May 3, 2013. This document refers to the July 3, 1975, drainage servitude deed described above affecting the property at issue in this case, as well as an attached copy of an undated drainage servitude deed recorded December 17, 1973, not separately introduced as evidence in this case. This December 17, 1973, document created a drainage servitude 130 feet wide in favor of the Terrebonne Parish Police Jury across lands of HBC, including the NW 1/4 of Section 10, T20S-R17E. Strictly speaking, the May 3, 2013, agreement does not directly affect the NW 1/4 of Section 10, T20S-R17E, but it does confirm the existence of the previous drainage servitude deed recorded December 17, 1973.

HBC has also furnished to the court a copy of a right-of-way grant by the State of Louisiana to HBC dated October 17, 2013, for the purpose of constructing a "culverted bayou crossing" through "a portion of Four Point Bayou located in Section 10, T17S-R20E." The permanent right-of-way was declared to be eighty feet wide. The designation of "T17S-R20E" in the agreement is an obvious error inasmuch as Four Point Bayou does not meander through "T17S-R20E," but rather through T20S-R17E. In any event, the reference to "4 Point Bayou Crossing" on the specifications attached to the document causes the court to think the crossing pertains to property outside of the NW 1/4 of T20S-R17E. This conclusion is based on the anticipated construction of a Four Point Bayou crossing mentioned in the agreement and amended servitudes document dated May 3, 2013, discussed hereinabove, in connection with the development of "Four Point

40

Harbor Subdivision" by HBC in Section 15, T20S-R17E, south of Section 10. The court finds that this grant of right-of-way by the state actually pertains to a portion of Four Point Bayou (or canal) in Section 15 or the SE 1/4 of Section 10, T20S-R17E.

The court has also been furnished a copy of a grant of servitudes by and between HBC, Four Point Harbor, L.L.C., and Terrebonne Levee and Conservation District, dated May 4, 2016. A review of this document and the map attached reveals that the agreement pertains to Section 22, T20S-R17E, and in no way affects the NW 1/4 of Section 10 in that range and township.

Finally, the court was furnished a copy of the "Dirt Contract" dated April 9, 2014, by HBC, as seller, and Low Land, as buyer, and a copy of the "Supplemental and Amended Dirt Contract" between the same parties dated February 26, 2015. The parties to this litigation have already agreed that these documents impact that portion of the NW 1/4 of Section 10, T20S-R17E, located on the east side of Four Point Canal.

By way of HBC Exhibit No. 44, HBC furnished to the court an extract from a Tobin map with reference to T20S-R17E, Terrebonne Parish, Louisiana, depicting property "occupied by Harry Bourg." The property is clearly identified as the NW 1/4 of Section 10. The map indicates that surrounding property on the north, east, and south sides thereof is owned by "Harry Bourg Corp." There is no indication on the document of the date of preparation of the map, but it obviously was prepared after 1955 when HBC acquired its lands from Harry Bourg. The plaintiffs offered the same Tobin map as Plaintiffs' Exhibit No. 16.

Neither Gaidry nor Schwing offered as evidence at trial any act purporting to constitute the creation of any surface right-of-way or servitude by them or their ancestors in title in the NW 1/4 of Section 10, T20S-R17E, after the April 10, 1942, purchase by Harry Bourg. They did offer, however, copies of numerous acts after that date by which their various authors in title transferred ownership of their interests in the NW 1/4 of Section 10, T20S-R17E, such that those interests are now owned by

41

Gaidry and Schwing.

## Hunting and Fishing

In an effort to show its obvious and unambiguous use of the property at issue, HBC also offered evidence of hunting and fishing activities on its behalf. Nolan Bergeron testified that he was the land manager for HBC for almost twenty years, until 1995. Before him, those duties were the responsibility of Freddie Trahan from the time HBC acquired its lands from Harry Bourg. HBC was vigilant about patrolling all of the property it owned, particularly to control hunting and fishing. There was a system of "passes" used at one time to grant visitors access. Mr. Bergeron testified that he did not patrol the NW 1/4 of Section 10 by boat and, on occasion, he did see Wilson "Doc" Gaidry, Jr., on HBC lands, but never on the NW 1/4 of Section 10.

The only documentary evidence offered by HBC regarding the sporting use of the NW 1/4 of Section 10, T20S-R17E, was HBC Exhibit No. 51. It consists of sixty different deer hunting permits granted by HBC to various individuals between 2004 and 2017. Each permit generally granted permission to the grantee to hunt on "designated property of Harry Bourg Corporation," without any further specification of which property was too be hunted. In a few instances, a map is attached to the deer hunting permit and some of these maps appear to indicate that HBC was regulating deer hunting in the NW 1/4 of Section 10 just south of the former homestead of Nora Bourg Breaux.

To support their claims of sporting use of the NW 1/4 of Section 10 by or on behalf of Gaidry and Schwing or their ancestors in title, the plaintiffs offered the testimony of Roger Webb, Wilson "Doc" Gaidry, Jr., Shannon J. Danos, and Leo Bickham.

According to Mr. Webb, age forty-seven, who owns an interest in Gaidry, he traditionally would access the property, either alone or with groups of people, by crossing the levee on the west side near the Cenac Duck Pond in adjacent Section 9. He would access the entry point by boat. At various times since

42

1986 or 1987, and multiple times a year, he would hunt or trap deer, alligators, rabbits, and nutria. He was not shy about shooting his shotgun shells and making his presence known. In all the years he was present on the property, no one indicated to him that he had no right to be there or otherwise obstructed his activities.

Mr. Danos, a forty-nine year old commercial fisherman, who sells bait and crabs and lives near the property in question, testified he has fished minnows and crawfish on the property with permission of Gaidry, always west of Four Point Canal. This activity appears to have occurred within less than ten years before trial. The court received as evidence, copies of four one-year leases for the calendar years 2011-2014 by which Mr. Danos leased from Gaidry, numerous properties in the Dulac area, for the purposes of "trapping, hunting, fishing, campsite, and other recreational and commercial activities." The leases always included the property described as the NW 1/4 of Section 10, T20S-R17E.

Mr. Bickham, affiliated with Gaidry, first visited the property in question in 1977 after his father died. In 1978, he began hunting on the property regularly until about 2004 or 2005. Like Mr. Webb and Mr. Gaidry, he would access the property on its western side, and no one interfered with his use of the property.

Mr. Gaidry testified that he has been familiar with the NW 1/4 of Section 10 since 1954 when he first visited the property as a fifteen year old boy. He estimated that he has been on the property at least twice each year since, primarily to hunt and/or trap ducks, nutria, minks, otters, and alligators. Like Mr. Webb, no one ever indicated to him that he had no right to be there or otherwise obstructed his activities. And like Mr. Webb, he would access the NW 1/4 of Section 10 from the west.

Mr. Gaidry identified Plaintiffs' Exhibit No. 10, a ten year hunting lease from Gaidry to Andrew Sheppard, dated October 1, 1984, affecting property which included the NW 1/4 of Section 10, T20S-R17E. He also identified Plaintiffs' Exhibit No. 8, a

43

water fowl hunting lease from Gaidry to Andrew Sheppard, dated September 10, 1995, which included the property identified as the NW 1/4 of Section 10, T20S-R17E. Mr. Gaidry also identified Plaintiffs' Exhibit No. 9, a trapping and hunting lease from Gaidry to Andrew Sheppard, dated September 10, 1995, which also included the same property.

Mr. Gaidry confirmed that by producing tax receipts for the NW 1/4 of Section 10, T20S-R17E, on behalf of Gaidry, he enabled his brother-in-law, Dane Ledet, to obtain Louisiana Wildlife and Fisheries permits to collect alligator eggs from the property beginning in 1996 through 2018. During those same years, he was able to obtain alligator licenses for himself based on Gaidry's ownership of the same property. The documents evidencing these permits and licenses were received by the court as Plaintiffs' Exhibit No. 7.

Mr. Gaidry testified that he was the one who discovered, during a trip to the Terrebonne Parish Tax Assessor's Office in 2016, that a dirt pit had been created on the east bank of Four Point Canal in the NW 1/4 of Section 10 on property he knew belonged in part to Gaidry and Schwing. It was that discovery that led to the filing of suit by Gaidry and Schwing against the defendants on May 23, 2017. He confirmed that he never thought HBC, despite all its acts of possession, was possessing the property adversely to, or to the exclusion of, Gaidry and Schwing.

### Mineral Exploration and Activity

HBC Exhibit No. 43 consists of an envelope mailed from Bellaire, Texas, on June 27, 1961, by Electronic Explorations, Inc., address to its company representative, Mr. J.V. Looney, in Thibodaux, Louisiana. With the envelope is a handwritten note signed by Mr. Looney referring to a check, apparently enclosed with the note, for damages "for shooting land of Harry Bourg in following sections...north half Section 10...." HBC apparently retrieved this item of evidence from the records of HBC and offered to show its possession of the land at or about that time.

44

Other than this one item of documentary evidence, the court did not received from HBC any evidence of mineral leasing or development with regard to the NW 1/4 of Section 10, T20S-R17E, after the property was acquired by Harry Bourg on April 10, 1942.

On the other hand, the court did receive evidence from the plaintiffs in this case that various oil, gas, and mineral leases were granted with regard to varying interests in and to the NW 1/4 of Section 10, T20S-R17E, by the Gaidry and Schwing authors in title, between 1955 and 1977, all of which were contemporaneously recorded, to wit:

(1) From T. Smith Hickman, et al, to S. Gordon Reese, dated December 17, 1955;

(2) From Wilson J. Gaidry, et al, to S. Gordon Reese, dated December 17, 1955;

(3) From E.B. Schwing, et al, to C.T. Carden, dated May 13, 1971;

(4) From Wilson J. Gaidry, Jr., et al, to C.T. Carden, dated May 7, 1971;

(5) From E.B. Schwing, et al, to Wolff Petroleum Co., Inc., effective December 4, 1974;

(6) From Lillie Lea McKnight Gaidry, et al, to Wolff Petroleum Co., Inc., effective November 25, 1974;

(7) From E.B. Schwing, et al, to Pennzoil Producing Company, Inc., effective May 6, 1977; and,

(8) From Lillie Lea McKnight Gaidry, et al, to Pennzoil Producing Company, Inc., effective May 10, 1977.

Based on all the evidence received by the court in this case regarding possession of the NW 1/4 of Section 10, T20S-R17E, by Harry Bourg and/or HBC, the court is convinced that at least since April 10, 1942, Harry Bourg and his successor by particular title, HBC, have had corporeal possession of the entirety of the property. There is no question that the possession has been continuous, peaceable, public, and unequivocal. Louisiana Civil Code article 3476 declares, however, that for the purpose of acquisitive prescription, the possession must be "continuous, uninterrupted, peaceable, public, and unequivocal."

The interruption of corporeal possession must be by acts of corporeal possession, not acts of civil possession, and must be more than mere disturbances.

45

does not run in favor of a precarious possessor, i.e., one who possesses without any intent to own another's interest, such as a co-owner, or his universal successor, regardless of how long the possession continues. Under our law, a precarious possessor, including a co-owner, is presumed to possess not for himself but for and on behalf of his co-owners. It is of no moment that the precarious possessor actually intends to possess for himself alone. He is presumed to possess for and on behalf of his co-owners, even if he actually intends to possess for himself. As pointed out by comment (b) of Louisiana Civil Code article 3438, this is a rebuttable presumption. A co-owner or his universal successor may commence to possess for himself, and thus begin the running of acquisitive prescription despite the presumption against him, when he demonstrates "by overt and unambiguous acts sufficient to give notice to his co-owner" that he intends to possess the property for himself alone.

These basic provisions of Louisiana property law have been consistently recognized by our courts. Lee v. Jones, 69 So.2d 26 (La. 11/09/53); Givens v. Givens, 273 So.2d 863 (La. App. 2 Cir. 2/06/73), writ denied, 275 So.2d 868 (La. 4/19/73); Towles v. Heirs of Morrison, 428 So.2d 1029 (La. App. 1 Cir. 2/22/83); Andras v. Thibodeaux, 157 So.3d 767 (La. App. 1 Cir. 10/30/14), writ denied, 204 So.3d 179 (La. 10/30/15); Ebarb v. The Unopened Succession of Sepulvado, 241 So.3d 1103 (La. App. 3 Cir. 3/14/18), writ denied, 244 So.3d 437 (La. 6/01/18).

Under Louisiana Civil Code article 3478, the acquisition and recordation of a title from a person other than a co-owner "may mark the commencement of prescription." Likewise, the particular successor of a precarious possessor, such as a co-owner, who takes possession under an act translative of ownership possesses for himself, and prescription runs in his favor from the commencement of his possession. (La. C.C. art. 3479.) These two articles of the Louisiana Civil Code have been the subject of much litigation in Louisiana. Succession of Seals, 150 So.2d 13 (La. 2/18/63); Givens, supra; Towles, supra; Franks

46

<u>Petroleum, Inc. v. Babineaux</u>, 446 So.2d 862 (La. App. 2 Cir. 2/21/84); <u>Lake Charles Harbor and Terminal District v. Erwin Heirs, Inc.</u>, 673 So.2d 1351 (La. App. 3 Cir. 05/08/96), writ denied, 681 So.2d 371 (La. 10/25/96); <u>Tilley v. Unopened Succession of Howard</u>, 976 So.2d 851 (La. App. 2 Cir. 2/20/08), writ denied, 983 So.2d 922 (La. 6/06/08); <u>Ebarb, supra</u>.

One case relied upon by HBC in the instant litigation is the Louisiana Supreme Court decision in <u>Succession of Seals</u>.

The widow and daughter of the deceased, Stokes Seals, prevailed on a claim of thirty years acquisitive prescription against the co-heirs, and thus co-owners of property, with Mr. Seals. Mr. Seals had acquired the property in question from his brother's widow by written act of sale in 1913. His brother, who had no children, had purchased the property while single. As a result, the widow from whom he purchased the property acquired no ownership rights to the property as a result of her husband's death. However, as one sibling of the deceased, Stokes Seals owned the property as co-heir with his other brothers and sisters. After the purported sale from his dead brother's widow, Mr. Seals took corporeal possession of the property and "exercised certain acts of possession, ownership and management." The court found Mr. Seals to have been a precarious possessor of the property whose possession was sufficiently adverse to his co-owners to justify the accrual of acquisitive prescription.

The concurring opinion of Justice McCaleb in the <u>Succession of Seals</u> opinion is instructive:

> A distinction should be recognized, I think, between a case like this, in which a co-owner pleading 30-year acquisitive prescription takes initial possession under a deed translative of the property, albeit invalid, and a case in which a co-owner enters possession of the whole without a paper title and without clearly indicating to the other co-owners that he intends his possession to be hostile to their interests. In the first instance, it strikes me that the very fact that he acquires a title for valuable consideration, as in this case, is sufficient to rebut any legal presumption that he is possessing for his co-heirs or co-owners, which normally obtains in cases in which the co-owner simply takes possession of the land. Accordingly, in this case, the fact that Stokes Seals entered the property in 1913 under a title and possessed as owner for over 30 years is sufficient, in my opinion, to warrant maintenance of the plea of 30-year acquisitive

prescription and this despite the fact, as indicated by the evidence, that he may have permitted some of his co-heirs to live thereon by sufferance.

It should be noted that in the Seals case, the initial possessor, Stokes Seals, was a co-owner of the property at the time of the act translative of title between him and his brother's widow. The decision of the Supreme Court upholding his claim of ownership was clearly based on thirty years acquisitive prescription. There was no express holding that the 1913 deed translative of title served as notice to his co-owners that he intended to possess the property at issue for himself. But the concurring opinion of Justice McCaleb declares that it did. In effect, Justice McCaleb's opinion indirectly declares that the particular successor to a precarious possessor under Louisiana Civil Code article 3479 includes a co-owner, i.e., one who already owns an undivided interest in the property. This appears to conflict with the second sentence of Louisiana Civil Code article 3478 which states: "The acquisition and recordation of a title from a person other than a co-owner thus may mark the commencement of prescription." (Emphasis added.)

It is in light of these Civil Code articles and the relevant jurisprudence that the court has analyzed the juridical acts upon which HBC relies to show that its ancestors in title possessed the NW 1/4 of Section 10, T20S-R17E, for themselves alone and not on behalf of their co-owners. All of the acts between May 14, 1927 (sheriff's sale to Madison L. Funderburk), and May 1, 1934 (purchase by Harry Bourg), inclusive, were acts translative of title, even though none of these acts transferred actual record title. This is so because until June 22, 1935, record title to the entirety of the NW 1/4 of Section 10, T20S-R17E was vested in the successors of Robert R. Barrow on the one hand, and in the successors of Mrs. Volumnia R. Barrow Slatter on the other. For reasons which will be explained below, the court does not deem these transactions to be of any importance in this case.

It is the act of sale dated April 10, 1942, from Ashby

48

W. Pettigrew to Harry Bourg that the court considers critically important. This act was translative of title. The description therein was sufficient to convey ownership of the property at issue in this case if it had been executed by the proper owners. At the time this act was executed by Ashby W. Pettigrew, any possession he had of the subject property was precarious inasmuch as he was a co-owner of the property with the ancestors of Gaidry and Schwing. Importantly, with regard to Harry Bourg, however, the exact language of Louisiana Civil Code article 3479 provides as follows:

> A particular successor of a precarious possessor who takes possession under an act translative of ownership possesses for himself, and prescription runs in his favor from the commencement of his possession.

In this case, Harry Bourg was the particular successor of Ashby W. Pettigrew, a precarious possessor of the property. Harry Bourg was not a co-owner of the property at the time the April 10, 1942, act was executed. As such, under Louisiana Civil Code article 3479, upon execution of the act, he possessed the property at issue for himself, and prescription began running in his favor "from the commencement of his possession." The law is clear that one who acquires property from a co-owner precarious possessor is presumed to possess the property for himself and adverse to his co-owners once he takes corporeal possession. Givens, supra; Towles, supra; Franks, supra; Lake Charles Harbor and Terminal District, supra; Tilley, supra.

The following language from the Louisiana Second Circuit Court of Appeal in the Givens case is illustrative:

> The well-settled jurisprudential general rule is that an owner in indivision cannot acquire by prescription the rights of his co-owners in the property held in common. Possession by one co-owner is generally considered as being exercised on behalf of all co-owners.

> * * *

> It is equally well-settled that an exception to the foregoing general rule is recognized in those instances wherein the adversely possessing co-owner gives notice to the other co-owners that he intends to possess contrary to the common interest. Under such circumstances one owner in common may prescribe against a party owning in indivision with him provided such possession be clearly hostile and notice be given

49

thereof.

* * *

> In determining whether a particular case falls within the exception rather than the general rule it has been held that mere occupancy, use, payment of taxes and similar acts of possession will not suffice to constitute notice of adverse possession to an owner in common.

The court went on to say, citing Succession of Seals:

> However, a solid line of cases has developed the rule that where a co-owner goes into and continues possession under a recorded instrument apparently conveying title (even though the purported conveyance be invalid), the recorded instrument together with the acts of possession constitute notice to other co-owners and the possession is then regarded as hostile to the claims of the other co-owners, rebutting any presumption that possession is for the benefit of all co-owners.

Likewise, in Towles the Louisiana First Circuit Court of Appeal had this to say:

> The possession by a co-owner inures to the benefit of the other co-owners, as owners in indivision cannot acquire title by prescription against one another, in the absence of clearly hostile possession by the possessing co-owner, which gives clear notice to the other co-owners of his intent to possess exclusively and adversely....Where one co-owner goes into and continues possession by reason of a deed translative or a partition declarative of title, the co-owner's possession is regarded as hostile to any claim of his co-owner, rebutting the presumption of precarious possession.

* * *

> The recordation of a deed translative of title is the important factor in giving notice of hostile and adverse possession to co-owners....The notice given by the recorded titles changes the nature of future possessor acts from precarious possession to adverse possession. The acts of corporeal possession must follow that notice.

By application of Louisiana Civil Code article 3479, without regard to the decision in Succession of Seals, the court finds that Harry Bourg, the particular successor of Ashby W. Pettigrew, a precarious possessor, gave clear notice to the other co-owners of the property his intent to possess exclusively and adversely when he executed the act of April 10, 1942, and recorded the same. However, this notice alone is not sufficient to sustain a claim of acquisitive prescription. It must be followed by actual acts of corporeal possession.

As described hereinabove, the record is replete with

50

evidence of actual corporeal possession of the property at issue by Harry Bourg and/or HBC through overt and unambiguous acts, at least from April 10, 1942, through the date of trial, a period of time in excess of seventy-five years. As explained hereinabove, the court believes the April 10, 1942, act constituted just title to the property and that Harry Bourg acquired the same in good faith. Because possession is transferable by particular title, Harry Bourg's possession can be claimed by HBC for its own benefit. HBC acquired Harry Bourg's real rights in and to the property from him and is entitled to "tack" this possession to its own from purposes of calculating the time necessary for acquisitive prescription. (La. C.C. art. 3441.) This "tacking of possession" is permitted as long as there has been no interruption of possession, that is, as long as the possessor does not abandon his possession and as long as the possessor is not evicted. (La. C.C. arts. 3442, 3433, and 3434). If one proves that he had possession at different times, he is presumed to have possessed during the intermediate periods. (La. C.C. art. 3443). Therefore, in the absence of some other legal impediment, the court is compelled to find that HBC is entitled to judgment in its favor declaring it to be the owner of the property at issue based on acquisitive prescription of both ten and thirty years.

As stated hereinabove, the court does not deem it necessary to discuss the transactions between 1927 and 1942 cited above that may have served as the basis for the commencement of acquisitive prescription that might be tacked on to the possession by Harry Bourg and/or HBC. The court deems these transactions irrelevant inasmuch as the court has not received any credible evidence of any actual corporeal possession of the NW 1/4 of Section 10, T20S-R17E, by any of the parties to those transactions. In the absence of actual possession, there can be no tacking.

## Bars to Accrual of Acquisitive Prescription

The court has considered the evidence in this case with

a view toward determining whether there might be some other legal impediment to the running of acquisitive prescription in favor of HBC, such that it would defeat its claims against Gaidry and Schwing.

Once possession begins, the intent to retain that possession is presumed "unless there is clear proof of contrary intention." (La. C.C. art. 3432.) The presumption is rebuttable. Possession may be lost if "the possessor manifests his intention to abandon it or when he is evicted by another by force or usurpation." (La. C.C. art. 3433.) If possession is lost, and not timely recovered, acquisitive prescription is deemed interrupted and commences to run anew from the last day of interruption. (La. C.C. arts. 3465 and 3466.)

None of the evidence in this case supports any assertion that Harry Bourg or HBC ever manifested any intention to abandon their possession of the property at issue or that they were ever evicted from the property by force or usurpation. In fact, the evidence is quite to the contrary. They consistently corporeally possessed the property by acts which included, among other things, the posting of signage, the raising of sugar cane, and the grazing of cattle. There is no evidence to suggest they were restricted or inhibited in these activities in any way by anyone. The evidence at trial confirmed that there was never any sharing of revenue derived from the NW 1/4 of Section 10, T20S-R17E, or any demand for such sharing by HBC or Harry Bourg with Gaidry or Schwing, and, likewise, by Gaidry or Schwing with HBC or Harry Bourg until the events which led to the filing of the petition in this case.

Under Louisiana Civil Code article 3435, possession that is "violent, clandestine, discontinuous, or equivocal" has no effect. Possession is violent when it is acquired or maintained by violent acts. Possession is clandestine when it is not open or public, discontinuous when it is not exercised at regular intervals, and equivocal when there is ambiguity as to the intent of the possessor to own the thing. (La. C.C. art. 3436.) Again,

52

the court has no evidence upon which it could reasonably find that any of these vices of possession are applicable to this case.

Acquisitive prescription is interrupted if suit is filed challenging the prescription, or if the right of the owner is acknowledged by the possessor, or if possession is lost. (La. C.C. arts. 3462, 3464, and 3465.) As discussed above, the court does not believe Harry Bourg or HBC ever lost possession. And there is no evidence that they ever affirmatively acknowledged any right of Gaidry and/or Schwing to the property they possessed. The only suit filed raising the issue of possession or acquisitive prescription is the instant suit filed May 23, 2017, long after the accrual of prescription in this case.

For all of the foregoing reasons, the court finds that HBC is the owner of the NW 1/4 of Section 10, T20S-R17E, Terrebonne Parish, Louisiana, having acquired ownership to a one-half interest in the same by way of the act of sale from Ashby W. Pettigrew on April 10, 1942, and having acquired all other outstanding interests thereto by acquisitive prescription based on possession by just title in good faith for ten years as of April 11, 1952, or alternatively, by possession for thirty years as of April 11, 1972. As owner of the property, it could cause the excavation and sale of dirt therefrom pursuant to its contract with Low Land Construction Company, Inc., free of any claim by or obligation to the plaintiffs in this case.

Because the court finds that Harry Bourg and HBC possessed the property at issue pursuant to an act translative of title, HBC is deemed to have possessed the entirety of the NW 1/4 of Section 10 referred to in the act, regardless of the actual area possessed by them on the ground. However, it appears their possession actually extended to the full limits of the property as described. The property at issue is bordered on the north, south, and east by other property of HBC acquired from Harry Bourg, and the evidence supports the finding that the possessive activities which occurred in the NW 1/4 of Section 10 spilled

53

over onto these other properties. On the west, fencing beyond the section line and a ditch and/or levee along the section line marked the limits of possession, which included at least the land of the NW 1/4 of Section 10.

Judgment has been entered in accordance with these reasons for judgment.

REASONS GIVEN in Chambers at Houma, Louisiana, on this 18 day of July, 2019.

DAVID W. ARCENEAUX,
District Judge

Please serve:

1. The plaintiffs, C.S. Gaidry, Inc., and Schwing Management, LLC, through their attorney of record Damon J. Baldone, 162 New Orleans Boulevard, Houma, Louisiana 70364.

2. The defendant, Harry Bourg Corporation, through its attorney of record, James M. Funderburk, 101 Wilson Avenue, P. O. Box 3017, Houma, Louisiana 70361.

3. The defendant, Low Land Construction Company, Inc., through its attorney of record, Rufus C. Harris, III, 650 Poydras Street, Suite 2710, New Orleans, Louisiana 70130.

FILED
JUL 18 2019
Deputy Clerk of Court
Parish of Terrebonne, LA